# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

KEVIN GOULD,

     Plaintiff,

v.                                     Case No.:_____

MICHAEL WYSE,
WYSE ADVISORS, LLC,
DW PARTNERS, and
CRYSTAL FINANCIAL,

     Defendants.

## DECLARATION OF MICHAEL WYSE

I, Michael Wyse, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that:

1.    I am a resident of New Jersey.  I am over 18 years of age and I have personal knowledge of the facts in this declaration.

2.    I am the Chairman of the Board of Directors of ONE Aviation Corporation (together with its affiliates, "One Aviation/Eclipse"), a debtor and debtor in possession in the chapter 11 bankruptcy case of *ONE Aviation Corporation, et. al.*, pending in the Bankruptcy Court for the District of Delaware (Case No. 19-12309 (CSS)).  I was engaged by One Aviation/Eclipse pursuant to a letter agreement dated August 16, 2017, attached hereto as Exhibit B-1.

3.    I serve as Managing Partner of Wyse Advisors, LLC ("Wyse Advisors"), a boutique firm focused on distressed/special situations.  Wyse Advisors is a New Jersey limited liability company with its principal place of business in New York. No member of Wyse Advisors, LLC is a resident of Idaho or New Mexico. *Id.*

4.    On October 23, 2017, I signed an agreement with Kevin Gould on behalf of One Aviation/Eclipse, attached hereto as Exhibit B-2 (the "Gould Employment Agreement").

EXHIBIT B

5.      I first received a copy of the mailed summons and complaint in the above captioned action on March 26, 2019.

6.      I believe that One Aviation/Eclipse has been and will continue to be forced to participate in this action to protect its legal and economic rights, including under the Gould Employment Agreement, which is the subject of the litigation.

7.      Under my employment agreement with One Aviation/Eclipse, the company owes me indemnification obligations that require it to repay my fees, expenses, and any other losses suffered in this litigation.  I have already incurred significant legal fees in this litigation.

8.      Finally, this litigation has distracted myself and other directors of One Aviation/Eclipse from focusing on the Company's business operations and reorganization efforts.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 24th day of April, 2019.


By  */s/ Michael Wyse*
Michael Wyse
Chairman of the Board of Directors
ONE Aviation Corporation

August 16, 2017
Page 1


Alan Klapmeier
CEO
ONE Aviation Corporation
2503 Clark Carr Loop, SE
Albuquerque, New Mexico


Mr. Klapmeier:

This letter agreement is entered into by, between, and among Michael Wyse, Managing Member of Wyse Advisors LLC ("WALLC" or "Wyse"), ONE Aviation Corporation together with its wholly owned subsidiary Eclipse Aerospace Inc., (jointly referred to herein as the "Company"), and confirms and sets forth the terms and conditions of the engagement (the "Engagement") of WALLC by the Company, including the scope of the services to be performed and the basis of compensation for those services.  Upon execution of this letter by each of the parties hereto, this letter will constitute an agreement by, between, and among WALLC and the Company, (the "Agreement").

1.   Description of Services.

(a)   Independent Board Member.  In connection with this Engagement, Wyse shall serve as an Independent Board Member ("IBM") of both One Aviation Corporation and of Eclipse Aerospace, Inc. No other person or entity shall act as IB

(b)   Duties. The IBM shall have those powers and duties as prescribed herein and as normally associated with the position of Independent Board Member of entities comparable to the Company and such other powers and duties as may be deemed appropriate and necessary, including, without limitation, to:

(i)   Review and evaluate the go-forward business:

(A)   Review plan and ensure execution on identified cost saving initiatives; and

(ii)   Evaluate additional strategic alternatives with the goal of maximizing value for the Company;

(iii)   Review, evaluate and ensure management of restructuring, recapitalization, refinancing and any sale related efforts, including participating in negotiations and implementation of such efforts;

**EXHIBIT B-1**

August 16, 2017
Page 2

        (iv)     Perform such other services as may be reasonably requested or deemed appropriate

        (v)     Take any and all actions necessary to fulfill the responsibilities set forth above, including executing all necessary documentation on behalf of the Company to effectuate the same.

    2.   <u>Information Provided by Company and Forward Looking Statements.</u> The Company shall use all reasonable efforts to: (i) provide the IBM with access to management and other representatives of the Company; and (ii) to furnish all data, material, and other information concerning the business, assets, liabilities, operations, cash flows, properties, financial condition and prospects of the Company that the IBM reasonably requests in connection with the services to be provided to the Company. The IBM shall rely, without further independent verification, on the accuracy and completeness of all publicly available information and information that is furnished by or on behalf of the Company and otherwise reviewed by the IBM in connection with the services performed for the Company. The Company acknowledges and agrees that the IBM is not responsible for the accuracy or completeness of such information and shall not be responsible for any inaccuracies or omissions therein, provided that if the IBM becomes aware of material inaccuracies or errors in any such information he shall promptly notify the Board of such errors, inaccuracies or concerns. The IBM is under no obligation to update data submitted to him or to review any other areas unless specifically requested by the Board to do so.

    3.   <u>Limitation of Duties.</u> The IBM does not make any representations or guarantees that, inter alia, (i) an appropriate sale transaction, restructuring proposal or strategic alternative can be formulated for the Company, (ii) any sale transaction, restructuring proposal or strategic alternative presented to the Company's management or the Board will be more successful, than all other possible sale transactions, restructuring proposals or strategic alternatives, (iii) a sale transaction is the best course of action for the Company, or (iv) if formulated, that any proposed sale transaction, restructuring plan or strategic alternative will be accepted by any of the Company's creditors and other constituents. Further, the IBM does not assume any responsibility for the Company's decision to pursue, or not pursue any business strategy, or to effect, or not to effect any transaction.

    4.   <u>Compensation.</u>

    (a) As compensation for these services, WALLC will be paid $300 per hour for time spent. Starting September 1, 2017, WALLC shall notify the Company in writing to the CEO and the CFO, when WALLC has reach twenty (20) hours of billable time for the then current month so that the Company can plan and budget for the services and the costs thereof.

August 16, 2017
Page 3

(b) In addition, Wyse will be reimbursed for his reasonable and documented out-of-pocket expenses incurred in connection with this assignment, such as travel, lodging, local transportation, reasonable working meals, duplicating, messenger and other delivery fees and telephone and internet charges.

(c) Wyse will regularly send the Company invoices monthly indicating fees and costs and expenses incurred. Payment is due upon receipt of each invoice.

5. <u>Termination.</u>

(a) On termination of the Agreement, any undisputed fees and expenses due to Wyse shall be remitted promptly (including fees and expenses that accrued prior to but are duly invoiced subsequent to such termination).

(b)  The provisions of this Agreement that give the parties rights or obligations beyond its termination shall survive and continue to bind the parties.

6. <u>No Audit.</u> The Company acknowledges and agrees that Wyse is not being requested to perform an audit, review or compilation, or any other type of financial statement reporting engagement that is subject to the rules of the AICPA, SEC or other state or national professional or regulatory body.

7. <u>No Third Party Beneficiary.</u> The Company acknowledges that all advice (written or oral) provided by Wyse to the Company in connection with this Engagement is intended solely for the benefit and use of the Company (limited to its Board and management) in considering the matters to which this engagement relates. The Company agrees that no such advice shall be used for any other purpose or reproduced, disseminated, quoted or referred to at any time in any manner or for any purpose other than accomplishing the tasks referred to herein without Wyse's prior approval (which shall not be unreasonably withheld), except as required by law, regulation (including stock exchange rules) or legal or administrative process.

8. <u>Conflicts.</u> Wyse is not currently aware of any relationship that has created or would create a conflict of interest with the Company or those parties-in-interest of which you have made Wyse aware. Because Wyse is a consultant who serves clients on a global basis in numerous cases, both in and out of court, it is possible that Wyse may have rendered or will render services to or have business associations with other entities or individuals which had or have or may have relationships with the Company, including creditors of the Company. Wyse will not be restricted by virtue of providing the services under this Agreement from providing services to other entities or individuals, including entities or individuals whose interests may be in competition or conflict with the Company, provided Wyse makes appropriate arrangements to ensure that the confidentiality of information is maintained and provided that Wyse will not represent the interests of any such entities or individuals directly in connection with the matters in which Wyse is serving

August 16, 2017
Page 4

the Company. During the term of this Agreement Wyse will not provide services to or on the behalf of DW Partners LP or for Crystal Financial LLC

    9. <u>Confidentiality.</u> Wyse shall keep as confidential all non-public information received from the Company in conjunction with this Agreement, except: (i) as requested by the Company or its legal personnel; (ii) as required by legal proceedings; or (iii) as reasonably required in the performance of this Agreement. All obligations as to non-disclosure shall cease as to any part of such information to the extent that such information is or becomes public other than as a result of a breach of this provision.

    10. <u>Indemnification/Limitations on Liability</u>. The Company shall indemnify the IBM to the same extent as the most favorable indemnification it extends to their officers or managers, whether under the Company's articles or certificate of incorporation, by contract or otherwise, and no reduction or termination in any of the benefits provided under any such indemnities shall affect the benefits provided to the IBM. The IBM shall be covered as an officer under the Company's existing director and officer liability insurance policy. As a condition of Wyse accepting this engagement, an endorsement to such director and officer liability policy evidencing such coverage shall be furnished to Wyse prior to the effective date of this Agreement. The Company shall give thirty (30) days' prior, written notice to Wyse of cancellation, non-renewal, or material adverse change in coverage, scope, or amount of such director and officer liability policy. The provisions of this section are in the nature of contractual obligations and no change in applicable law or the Company's charters, operating agreements or other organizational documents or policies shall affect the Indemnified Parties' (as defined below) rights hereunder. The attached indemnity and limitation on liability provisions are incorporated herein and the termination of this Agreement or the Engagement shall not affect those provisions, which shall remain in full force and effect.

    11. <u>Miscellaneous.</u> This Agreement (together with the attached indemnity provisions), including, without limitation, the construction and interpretation of thereof and all claims, controversies and disputes arising under or relating thereto, shall be governed and construed in accordance with the laws of the State of New York, without regard to principles of conflict of law that would defer to the laws of another jurisdiction. The Company and Wyse agree to waive trial by jury in any action, proceeding or counterclaim brought by or on behalf of the parties hereto with respect to any matter relating to or arising out of the engagement or the performance or non-performance of Wyse hereunder.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

August 16, 2017
Page 5

       This Agreement shall be binding upon Wyse and the Company, their respective heirs, successors, and assignees, and any heir, successor, or assignee of a substantial portion of Wyse's or the Company's respective businesses and/or assets, including any Chapter 7/11 Trustee. This Agreement incorporates the entire understanding of the parties with respect to the subject matter hereof and supersedes all prior written or oral agreements and understandings with respect thereto, and may not be amended or modified except in writing executed by the Company and Wyse.

If the foregoing is acceptable to you, kindly sign the enclosed copy to acknowledge your agreement with its terms.

Accepted and agreed:

**ONE Aviation Corporation**

**By:**
       **Alan Klapmeier**
       **CEO**

**Eclipse Aerospace Inc**

By:   _____
       Alan Klapmeier
       CEO

**Wyse Advisors LLC**

By:   *Michael Wyse*
       Michael Wyse
       Managing Member

## INDEMNIFICATION AND LIMITATION ON LIABILITY AGREEMENT

This indemnification and limitation on liability agreement is made part of an agreement, dated August 16, 2017 (which together with any renewals, modifications or extensions thereof, is herein referred to as the "Agreement") by and between Michael Wyse, Managing Partner of Wyse Advisors LLC ("WALLC " or "Wyse") on the one hand, and ONE Aviation Corporation and its wholly owned subsidiary Eclipse Aerospace Inc., referred to herein as the "Company", and its successors and assigns, on the other hand, for services to be rendered to the Company by Wyse.

A. The Company agrees to indemnify and hold harmless each of Wyse, his affiliates, heirs, successors and assigns and his employees, agents, representatives and subcontractors (each, an "Indemnified Party" and collectively, the "Indemnified Parties") against any and all losses, claims, damages, liabilities, penalties, obligations and expenses, including the costs for counsel or others reasonably incurred as a result of and in the course of investigating, preparing or defending any action or claim in connection with litigation in which any Indemnified Party is a party or as to which a claim against an Indemnified Party has been, asserted in writing, or enforcing the Agreement (including these indemnity provisions), as and when incurred, caused by, relating to, based upon or arising out of (directly or indirectly) the Indemnified Parties' acceptance of or the performance or nonperformance of their obligations under the Agreement; provided, however, such indemnity shall not apply to (i) any such loss, claim, damage, liability or expense to the extent it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from such Indemnified Party's breach of the confidentiality obligations contained in this Agreement, gross negligence or willful misconduct and (ii) any claim by the Company against Wyse as to Wyse's breach of Wyse's express obligations under this Agreement. The Company also agrees that (a) no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company for or in connection with the engagement of Wyse, except to the extent that any such liability for losses, claims, damages, liabilities or expenses are found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from such Indemnified Party's gross negligence or willful misconduct and (b) in no event will any Indemnified Party have any liability to the Company for special, consequential, incidental or exemplary damages or loss (nor any lost profits, savings or business opportunity). The Company further agrees that it will not, without the prior consent of an Indemnified Party, settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which such Indemnified Party seeks indemnification hereunder (whether or not such Indemnified Party is an actual party to such claim, action, suit or proceedings) unless such settlement, compromise or consent includes an unconditional release of such Indemnified Party from all liabilities arising out of such claim, action, suit or proceeding.

B. These indemnification provisions shall be in addition to any liability which the Company may otherwise have to the Indemnified Parties. In the event that, at any time whether before or after termination of the engagement or the Agreement, as a result of or in connection with the Agreement or Wyse's role under the Agreement, Wyse or any Indemnified Party is required to produce any of its personnel (including former employees) for examination, deposition or other written, recorded or oral presentation, or Wyse or any other Indemnified Party is required to produce or otherwise review, compile, submit, duplicate, search for, organize, or report on any material within such Indemnified Party's possession or control pursuant to a subpoena or other

10298455

legal (including administrative) process, the Company will reimburse the Indemnified Party for his, her or its out of pocket expenses, including the reasonable fees and expenses of his, her or its counsel.

C. If any action, proceeding or investigation is commenced to which any Indemnified Party proposes to demand indemnification hereunder, such Indemnified Party will notify the Company with reasonable promptness; provided, however, that any failure by such Indemnified Party to notify the Company will not relieve the Company from its obligations hereunder, except to the extent that such failure shall have actually prejudiced the defense of such action. The Company shall promptly pay expenses reasonably incurred by any Indemnified Party in defending, participating in, or settling any action, proceeding or investigation in which such Indemnified Party is a party or is threatened to be made a party or otherwise is participating in by reason of the engagement under the Agreement, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise. Each Indemnified Party hereby undertakes, and the Company hereby accept their undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such Indemnified Party is not entitled to be indemnified therefor. If any such action, proceeding or investigation in which an Indemnified Patty is a party is also against the Company, the Company may, in lieu of advancing the expenses of separate counsel for such Indemnified Party, provide such Indemnified Party with legal representation by the same counsel who represents the Company provided such counsel is reasonably satisfactory to such Indemnified Party, at no cost to such Indemnified Party; provided, however, that if such counsel or counsel to the Indemnified Party shall determine that due to the existence of actual or potential conflicts of interest between such Indemnified Party and the Company such counsel is unable to represent both the Indemnified Party and the Company, then the lndemnified Party shall be entitled to use separate counsel of his, her or its own choice, and the Company shall promptly advance the reasonable expenses of such separate counsel upon submission of invoices therefor. Nothing herein shall prevent an Indemnified Party from using separate counsel of his, her or its own choice at his, her or its own expense. The Company will be liable for any settlement of any claim against an Indemnified Party made with the Company's written consent, which consent shall not be unreasonably withheld.

D. In order to provide for just and equitable contribution if a claim for indemnification pursuant to these indemnification provisions is made but it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) that such indemnification may not be enforced in such case, even though the express provisions hereof provide for indemnification, then the relative fault of the Company, on the one hand, and the, Indemnified Parties, on the other hand, in connection with the statements, acts or omissions which resulted in the losses, claims, damages, liabilities and costs giving rise to the indemnification claim and other relevant equitable considerations shall be considered; and further provided that in no event will the Indemnified Parties' aggregate contribution for all losses, claims, damages, liabilities and expenses with respect to which contribution is available hereunder exceed the amount of fees actually received by the Indemnified Parties pursuant to the Agreement. No person found liable for a fraudulent misrepresentation shall be entitled to contribution hereunder from any person who is not also found liable for such fraudulent misrepresentation.

E. In the event the Company and Wyse seek judicial approval for the assumption of the Agreement or authorization to enter into a new engagement agreement pursuant to either of which

2

Wyse would continue to be engaged by the Company, the Company shall promptly pay expenses reasonably incurred by the Indemnified Parties, including attorneys' fees and expenses, in connection with any motion, action or claim made either in support of or in opposition to any such retention or authorization, whether in advance of or following any judicial disposition of such motion, action or claim, promptly upon submission of invoices therefor and regardless of whether such retention or authorization is approved by any court. The Company will also promptly pay the Indemnified Parties for any expenses reasonably incurred by them, including attorneys' fees and expenses, in seeking payment of all amounts owed it under the Agreement (or any new engagement agreement) whether through submission of a fee application or in any other manner, without offset, recoupment or counterclaim.

F. Neither termination of the Agreement nor termination of Wyse's engagement nor the filing of a petition under Chapter 7 or 11 of the United States Bankruptcy Code (nor the conversion of an existing ease to one under a different chapter) shall affect these indemnification provisions, which shall hereafter remain operative and in full force and effect.

G. The rights provided herein shall not be deemed exclusive of any other rights to which the Indemnified Parties may be entitled under the articles or certificate of formation or operating agreement of the Company, any other agreements, any vote of members of the Company, any applicable law or otherwise.

*Michael Wyse*
_____
Michael Wyse

Accepted and Agreed:

**Eclipse Aerospace Inc.**

By: _____
    Alan Klapmeier
    CEO

By:
    Alan Klapmeier
    CEO

3

ONE AVIATION

# Employment Agreement

This Employment Agreement ("Agreement") is made and entered into as of the 23rd day of October, 2017 (the "Effective Date") by and between OAC Management Inc. (the "Company") and Kevin Gould ("Employee").

## R E C I T A L S

The Company desires to employ Employee on the terms and conditions set forth herein, and Employee desires to accept such employment.

NOW, THEREFORE, in consideration of the mutual promises, terms, covenants and conditions set forth herein, and the performance of each, the parties hereto, intending to be legally bound, agree as follows:

## AGREEMENTS

**1. Term.** The Company and the Employee acknowledge that the Employee's employment is and shall continue to be at-will, as defined under applicable law, and may be terminated by either party at any time, with or without notice. If the Employee's employment terminates for any reason, the Employee shall not be entitled to any payments, benefits, damages, awards or compensation other than as provided by this agreement, or as may be available in accordance with the Company's established employee plans or pursuant to other written agreement with the Company.

**2. Position and Duties.** Employee shall serve as Chief Operating Officer of Eclipse Aerospace as well as a Board Member of One Aviation, Inc.. Employee shall also have such additional responsibilities, duties, and authorities as may be reasonably assigned to him by the Board of Directors. Employee shall fulfill all of his duties and responsibilities in a reasonable and appropriate manner and in compliance with the Company's policies and practices and the laws and regulations that apply to the Company's operation and administration. Employee shall devote substantially all of his business time and attention to the business and affairs of the Company.

**3. Compensation.** For all services rendered by Employee, whether as an employee, officer, or director of the Company, the Company shall compensate Employee as follows:

*Base Salary.* As of the Effective Date, the annual salary payable to Employee shall be US Dollars Three Hundred and Thirty Thousand (US$330,000), less applicable withholdings and taxes, payable on a regular basis in accordance with the Company's



**ECLIPSE**

**Eclipse Aerospace**
2503 Clark Carr Loop SE
Albuquerque, NM 87106
United States of America
PH 847.850.7560



**KESTREL**

**Kestrel Aircraft**
1401 Tower Avenue
Superior, WI 54880
United States of America
PH 715.718.5000



**EXHIBIT B-2**

standard payroll procedures (the "Base Salary"). Employee shall receive annual increases in an amount to approved by the Board of Directors. Any increase in Base Salary shall not limit, reduce or be offset by any other obligation of the Company to Employee under this Agreement.

(a) Transaction Bonus. Employee shall receive one or more transaction bonuses
(the "Bonuses") during the Term provided he is employed by the Company. The Bonuses shall be based on all receipts of cash by the Senior Secured Lenders and may comprise several transactions.  The Bonuses shall be paid at closing of each such transaction. The step calculations in (i) through (v) below shall be applied cumulatively so that subsequent transactions are added to prior ones to recalculate the total Bonus amount, less Bonus amounts paid previously.  For example, if Transaction 1 is for $18,000,000, the Bonus amount would be $0.  If Transaction 2 later takes place for $5,000,000, the Bonus amount payable at the time of closing of Transaction 2 would be $230,000 (1% of $23,000,000).  If Transaction 3 then takes place for $10,000,000, the Bonus amount payable at the time of closing of Transaction 3 would be $760,000 (3% of $33,000,000, less the $230,000 already paid).

Bonus amount table (% applied to transactions total falling within amounts shown):
(i)   1% between $20MM and $25MM cumulative total transactions amount
(ii)  2% between $25MM and $30MM cumulative total transactions amount
(iii) 3% between $30MM and $35MM cumulative total transactions amount
(iv) 4% between $35MM and $40MM cumulative total transactions amount
(v)  5% over $40MM cumulative total transactions amount

(b)  Transaction bonus will be carved-out from proceeds available for distribution to the Senior Secured Lenders.

(c)  *Perquisites, Benefits, and Other Compensation.* Employee shall be eligible for such perquisites, benefits, and other compensation as specified from time to time by the Board including paid vacation of fifteen (15) days per year. Unused vacation shall not be carried forward from year to year unless expressly approved by the Company.

(d) *Relocation.* Employee shall be provided with Five Thousand ($5000) paid in one lump sum for relocation expenses.



**(d)** *Professional Memberships.* Company will pay all reasonable costs of professional membership, including dues and costs of maintaining such membership (i.e. aviation organizations, continuing education seminars, etc.) incurred and billed during the term of this Agreement as approved in advance by the Company.

**4. Expense Reimbursement.** The Company shall reimburse Employee for (or, at the Company's option, pay) all business travel and other out-of-pocket expenses reasonably incurred by Employee in the performance of his services hereunder during the Term. All reimbursable expenses shall be in compliance with established Company rules and policies and shall appropriately documented in reasonable detail by Employee upon submission of any request for reimbursement, and in a format and manner consistent with the Company's expense reporting policies and applicable federal and state tax record keeping requirements, as approved by the Chief Financial Officer.

**5. Place of Performance.** Employee shall carry out his duties and responsibilities hereunder principally in and from the Albuquerque, New Mexico area.

**6. Termination; Rights on Termination.** This Agreement and Employee's employment may be terminated in any one of the following ways, prior to the expiration of the Term:

    **(a)** *Termination by the Company For Good Cause.*

        (i) The Company may terminate this Agreement and Employee's employment for "Good Cause". "Good Cause" shall mean: (A) Employee's willful or intentional breach of any material term of this Agreement, including but not limited those contained in paragraphs 8 or 9; (B) Employee's continued willful material misconduct or gross negligence in the performance or nonperformance of any of Employee's material duties or responsibilities; (C) Employee's willful dishonesty, or fraud with respect to the business or affairs of the Company; or (D) Employee's conviction of any felony involving theft, fraud, or dishonesty. In the event of termination of Employee's employment and this Agreement for Good Cause, no compensation or benefits shall be payable to Employee after the date of termination except as required by law.

        (ii) For the purposes hereof, no act or failure or refusal to act on Employee's part shall be considered "willful" unless done, or omitted to be done, by Employee, not in good faith and without belief that his action or omission was in the best interest of the Company. In addition Good Cause shall not include any one or more of the following: (A) bad



judgment, (B) negligence or (C) any act or omission that Executive believed in good faith to have been in or not opposed to the interest of the Company (without intent of Executive to gain therefrom, directly or indirectly, a profit to which he was not legally entitled).

(iii) Prior to termination of this Agreement by the Company for Good Cause, the Company shall provide Employee with written notice specifying in reasonable detail the basis for determining Good Cause, with a period of thirty (30) days to cure the basis for such termination if the action is of a type that can be cured (e.g. theft or conviction of a crime is
not curable).

**(b)** *Termination by the Company Without Good Cause.* At any time during the Term, the Company may, without Good Cause and for any reason whatsoever, terminate this Agreement and Employee's employment after written notice is provided to Employee.

**(c)** *Termination by Employee for Good Reason*

(i) Employee may terminate this Agreement and his employment for "Good Reason". "Good Reason" shall mean: (A) without Employees written consent, a removal of Employee from the Board of the Company or any of the Companies (or failure to elect Employee to the Board of any of the Companies) or a material change in status or an increase or reduction of Employees duties, authority, and responsibilities relative to Employees duties and responsibilities and authority in effect on the effective date, (B) the failure by the Company to continue to provide Employee with Base Salary at least as favorable, and no less than, the Base Salary in effect on the Effective Date; (C) a breach by the Company of any material terms of this Agreement; or (D) a change in control of Company or Company's parent company where a change in control is defined as any event where immediately after the event the current shareholders of the Company (or the parent company) no longer have majority voting control or otherwise control the ongoing business of the Company (or the parent company or a subsidiary of the parent company for which Employee is providing services through Company as COO); (E) Company is involved in or requires Employee to undertake deceptive practices or make fraudulent actions or make materially untrue statements on behalf of the Company.

(ii) Prior to termination of this Agreement by Employee for Good Reason, Employee shall provide the Company with written notice specifying in reasonable detail the basis for determining Good Reason,



with a period of thirty (30) days for Company to cure the basis for such termination if the action is of a type that can be cured.

**(d)** *Termination by Employee Without Good Reason.* At any time during the Term, Employee may, without Good Reason and for any reason whatsoever, terminate this Agreement and his employment, effective sixty (60) days after written notice is provided to the Company.

**(e)** *Severance Payments.* Upon termination of Employee's employment, and the Employee's execution of a Non-Disparagement and Non-Solicitation agreement and in accordance with the provisions contained in Paragraph 1 (non-renewal by Company or Employee), Paragraph 6(b) (Termination by the Company without Good Cause) or 6(d) (Termination by Employee for Good Reason), the Company shall pay Employee his monthly Base Salary for six (6) months paid in conformance with normal payroll procedures, and Employee shall receive the full amount of the Annual Bonus under Section 3(b) for the year of termination if Employee's termination is after the end of the second quarter for such, prorated as Salary through the date of termination (calculated by the day based on a 365 day year) and the Company shall offer continued coverage under the Company's health care plan for Employee and/or his qualified dependents pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), with the Company paying the costs of that continued COBRA coverage for a period of twelve (12) months.

**(f)** *Provisions that Survive Termination of Agreement.* All rights and obligations of the Company and Employee under this Agreement shall cease as of the effective date of termination or expiration, except that

> (i) the Company's obligations under Paragraphs 4, 10, 16 and 17 shall survive such termination in accordance with their terms and
> (ii) Employee's obligations under Paragraph 8, 9, 16 and 17 shall survive such termination in accordance with their terms.

**(g)** *Right to Offset.* In the event of any termination of Employee's employment under this Agreement for any reason, the Company's obligation to make any payments shall be subject to offset for any indebtedness of Employee to the Company.

## 8. Trade Secrets and Confidential Information.

**(a)** For purposes of this Agreement, "Confidential Information" means any data or information (other than Trade Secrets) that is valuable to the Company (or, if owned by someone else, is valuable to that third party) and not generally known to the public or to competitors in the industry, including, but not limited to, any non-public information (regardless of whether in writing or retained as personal knowledge) pertaining to research and development; product costs and processes;



stockholder information; pricing, cost, or profit factors; quality programs; annual budget and long range business plans; marketing plans and methods; contracts and bids; and personnel. "Trade Secret" shall have the meaning given to it under applicable state law. In the absence of a state law definition, Trade Secret means information including, but not limited to, any technical or nontechnical data, formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, financial plan, product plan, list of actual or potential customers or suppliers or other information similar to any of the foregoing, which

> (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can derive economic value from its disclosure or use and

> (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

**(b)** Employee acknowledges that he is employed by the Company in a fiduciary capacity wherein he, in the course of his employment with the Company, has received and will receive Confidential Information and Trade Secrets of the Company and the Associated Companies, including but not limited to confidential and secret business and marketing plans, strategies, and studies, detailed client/customer lists and information relating to the operations and business requirements of those clients/customers and, accordingly, he is willing to enter into the covenants contained in Paragraph 8 of this Agreement in order to provide the Company with what he considers to be reasonable protection for its interests.

**(c)** Employee hereby agrees that, during the Term and for a period of five (5) years thereafter, he will hold in confidence all Confidential Information of the Company and the Associated Companies that came into his knowledge during his employment by the Company and will not disclose, publish or make use of such Confidential Information without the prior written consent of the Company. In addition, Employee will return all copies of Company Confidential Information in written or electronic for to the Company within 7 days of employment termination.

**(d)** Employee hereby agrees to hold in confidence all Trade Secrets of the Company and the Associated Companies that came into his knowledge during his employment by the Company and shall not disclose, publish, or make use of at any time after the date hereof such Trade Secrets without the prior written consent of the Company for as long as the information remains a Trade Secret.

**(e)** Notwithstanding the foregoing, the provisions of this Paragraph 8 will not apply to



(i) information required to be disclosed by Employee in the ordinary course of his duties hereunder or

(ii) Confidential Information that otherwise becomes generally known in the industry or to the public through no act of Employee or any person or entity acting by or on Employee's behalf. Nothing in this Paragraph 8 shall prohibit Employee from testifying to, or disclosing information, if compelled to do so by law. The parties agree that the restrictions stated in this Paragraph 7 are in addition to and not in lieu of protections afforded to trade secrets and confidential information under applicable state or federal law. Nothing in this Agreement is intended to or shall be interpreted as diminishing or otherwise limiting the Company's rights under.

**9. Work Product and Inventions.** Employee acknowledges that Employee's work on and contributions to documents, programs, methodologies, protocols, and other expressions in any tangible medium which have been or will be prepared by Employee, or to which Employee has contributed or will contribute, in connection with Employee's services to the Company (collectively "Works"), are and will be within the scope of Employee's services and part of Employee's duties and responsibilities. Employee's work on and contributions to the Works will be rendered and made by Employee for, at the instigation of, and under the overall direction of, the Company, and are and at all times shall be regarded, together with the Works, as "work made for hire" as that term is used in the United States Copyright Laws. However, to the extent that any court or agency should conclude that the Works (or any of them) do not constitute or qualify as a "work made for hire", Employee hereby assigns, grants, and delivers exclusively and throughout the world to the Company all rights, titles, and interests in and to any such Works, and all copies and versions, including all copyrights and renewals. Employee agrees to cooperate with the Company and to execute and deliver to the Company, its successors and assigns, any assignments and documents the Company requests for the purpose of establishing, evidencing, and enforcing or defending its complete, exclusive, perpetual, and worldwide ownership of all rights, titles, and interests of every kind and nature, including all copyrights, in and to the Works, and Employee constitutes and appoints the Company as its agent to execute and deliver any assignments or documents Employee fails or refuses to execute and deliver, this power and agency being coupled with an interest and being irrevocable. Without limiting the preceding provisions of this Paragraph, Employee agrees that the Company may edit and otherwise modify, and use, publish and otherwise exploit, the Works in all media and in such manner as the Company, in its sole discretion, may determine.

**10. Indemnification.** Employee shall be indemnified and held harmless by Company and each of the companies that Employee provides executive services to the fullest extent permitted by law for executive officers as if Employee were a direct employee of such entities.



**11. Assignment; Binding Effect**. Employee understands that he has been selected for employment by the Company on the basis of his personal qualifications, experience, and skills. Employee agrees, therefore, that he cannot assign all or any portion of his performance under this Agreement. The Company may assign this Agreement to the purchaser of substantially all of the assets of the Company or its parent company, provided that any such assignee shall assume this Agreement in a writing delivered to Employee. Subject to the preceding two sentences, this Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties and their respective heirs, legal representatives, successors, and assigns.

**12. Complete Agreement; Waiver; Amendment**. Employee has no oral representations, understandings, or agreements with the Company or any of its officers, directors, or representatives covering the same subject matter as this Agreement. This Agreement is the final, complete, and exclusive statement of expression of the agreement between the parties hereto with respect to the subject matter hereof, and cannot be varied, contradicted, or supplemented by evidence of any prior or contemporaneous oral or written agreements. This written Agreement may not be later modified except by a further writing signed by the Employee and a duly authorized, non-interested officer of the Company, and no term of this Agreement may be waived except by a writing signed by the party waiving the benefit of such term.

**13. Notice**. Whenever any notice is required hereunder, it shall be given in writing addressed as follows:

> To the Company: OAC Management Inc.
> Or Board Members Attn: Board of Directors
>
> To the Employee: Mr. Kevin Gould
> 1212 Victoria Dr.
> St. Helena, CA 94574
> With an email copy to: kevinjgould@hotmail.com

**14. Severability; Headings**. If any portion of this Agreement is held invalid or inoperative, the other portions of this Agreement shall be deemed valid and operative and, so far as is reasonable and possible, effect shall be given to the intent manifested by the portion held invalid or inoperative. This severability provision shall be in addition to, and not in place of, the provisions of Paragraph 11 above. Paragraph headings are for reference purposes only and are not intended in any way to describe, interpret, define, or limit the extent of the Agreement or of any part hereof.

**15. Remedies**. Because of the difficulty of measuring economic losses to the Company as a result of a breach of the covenants set forth in Paragraphs 8 and 9 and because of the immediate and irreparable damage that would be caused to the Company for which monetary damages would not be a sufficient remedy, it is hereby agreed that in addition to any economic remedy available to the Company, the Company shall be entitled to



specific performance and injunctive or other equitable relief as a remedy, without the necessity of posting a bond, for any breach or threatened breach of such covenants.

**16. Jointly Drafted.** The parties have participated jointly in the negotiation and drafting of this Agreement. In the event that an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

**17. Governing Law.** Unless the parties This Agreement shall in all respects be governed by and construed in accordance with the laws of the State of New Mexico, not including the choice-of-law rules thereof. All disputes arising from or relating to this Agreement shall be subject to the exclusive jurisdiction of and be litigated in the state or federal courts located in the State of New Mexico or such other jurisdiction mutually agreeable to the parties. All parties hereby consent to the exclusive jurisdiction and venue of such courts for the litigation of all disputes and waive any claims of improper venue, lack of personal jurisdiction, or lack of subject matter jurisdiction as to any such disputes.

**IN WITNESS WHEREOF,** the parties hereto have caused this Employment Agreement to be duly executed as of the date first written above.

**OAC Management Inc.**



By: _____
Title: _____
**EMPLOYEE:**
Kevin Gould

One Aviation Corporation guarantees all obligations and commitments to and for the benefit of Employee under this Agreement. This guarantee shall be broadly interpreted for the benefit of Employee as Company is a wholly owned subsidiary of One Aviation Corporation and as such is under its direction and control.
One Aviation Corporation

_____
By: _____
Title: _____



specific performance and injunctive or other equitable relief as a remedy, without the necessity of posting a bond, for any breach or threatened breach of such covenants.

**16. Jointly Drafted.** The parties have participated jointly in the negotiation and drafting of this Agreement. In the event that an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

**17. Governing Law.** Unless the parties This Agreement shall in all respects be governed by and construed in accordance with the laws of the State of New Mexico, not including the choice-of-law rules thereof. All disputes arising from or relating to this Agreement shall be subject to the exclusive jurisdiction of and be litigated in the state or federal courts located in the State of New Mexico or such other jurisdiction mutually agreeable to the parties. All parties hereby consent to the exclusive jurisdiction and venue of such courts for the litigation of all disputes and waive any claims of improper venue, lack of personal jurisdiction, or lack of subject matter jurisdiction as to any such disputes.

**IN WITNESS WHEREOF**, the parties hereto have caused this Employment Agreement to be duly executed as of the date first written above.

**OAC Management Inc.**

By: _____
Title: _____
**EMPLOYEE:** _____
Kevin Gould

One Aviation Corporation guarantees all obligations and commitments to and for the benefit of Employee under this Agreement. This guarantee shall be broadly interpreted for the benefit of Employee as Company is a wholly owned subsidiary of One Aviation Corporation and as such is under its direction and control.
One Aviation Corporation

By: _Mike Wyse_____
Title: _Board Member_____