## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

KEVIN GOULD,

     Plaintiff,

v.                          Case No.: 1:19-cv-00382-WJ-SCY

MICHAEL WYSE,
WYSE ADVISORS, LLC,
DW PARTNERS, and
CRYSTAL FINANCIAL,

     Defendants.

### Declaration of Kevin Gould

1.  My name is Kevin Gould, and I am the Plaintiff in this lawsuit.

2.  I lived in Albuquerque, New Mexico and served as the Chief Operating Officer of ONE
    Aviation, the parent company of Eclipse Aviation, from October 23, 2017 to December
    19, 2018.

3.  In 2015, DW Partners became the Senior Secured Lender ("SSL") of ONE Aviation
    when it purchased the total value of Eclipse's defaulted debt from Wells Fargo Bank.
    DW would eventually merge Eclipse Aviation with Kestrel to form ONE Aviation.
    Crystal Financial was the other Senior Secured Lender, acquiring and holding 25% of
    DW Partners' SSL position. DW and Crystal believed the projected long-term cash flows
    from the continued manufacturing of the Eclipse EA550 aircraft and its maintenance and
    spare parts business would justify a much higher valuation. In short, DW and Crystal
    anticipated that they would be able to sell their debt position for face value, which would
    yield DW and Crystal a tidy profit on their $15 million investment. By the summer of
    2017, however, ONE Aviation began to run out of money and faced declining revenues.

# EXHIBIT 1

Unpaid creditors and legal disputes led to a number of judgments against the company, and suppliers began cutting off materials needed for manufacturing, maintenance, and spare parts.

4. Matthew Governali was the Managing Director of Crystal Financial, and the individual from Crystal Financial with whom I interacted the most. John Buck, the Managing Principal of DW Partners, was the individual from DW Partners with whom I interacted the most.

5. Crystal began to act as the agent of the two SSLs and in the summer of 2017 exercised its power of "Cash Dominion," sweeping all revenue from ONE Aviation into Crystal's bank account and doling out just enough cash to make reduced payroll, buy certain parts, and pay the most emergent debts. DW and Crystal recognized that they needed industry expertise in running an airplane company and managing difficult financial and legal situations. In July 2017 they turned to me, hiring me as a consultant.

6. John Buck hired Mike Wyse of Wyse Advisors, LLC, in the Fall of 2017 to serve as the Chairman of the Board of Directors of ONE Aviation. Mr. Wyse and Mr. Buck had a history of working on prior similar "rescues" together. Although I do not know the specific terms of Mr. Wyse's financial arrangement with DW and Crystal, it is my understanding that Mr. Wyse would benefit, and did benefit, from his and my efforts in successfully steering ONE Aviation to a profitable sale through continued future employment opportunities with Mr. Buck in addition to reputational reward.

7. John Buck, Mike Wyse, Matthew Governali, and other agents and employees of DW Partners and Crystal Financial recruited me to leave my consultant role and take over operations of ONE Aviation and Eclipse Aerospace as the titular Chief Operations

2

Officer and the functional Chief Executive Officer, with the previous CEO left in place in title only, given his name recognition.

8. Before moving to Albuquerque and starting work at ONE Aviation, John Buck, Joel Biran, and Robert Clark of DW Partners, and Matt Governali of Crystal Financial engaged in numerous telephone discussions with me regarding the problems Eclipse Aerospace was facing, my ideas for operating and rescuing the company, and offering their own ideas regarding how I should operate the company. Those discussions specifically included telephone conferences with Joel Biran, Matt Governali, Kieran McGarrell and others on September 20, 2017, with John Buck and Joel Biran on October 11, 2017, and with John Buck, Joel Biran, and Robert Clark on October 13, 2017.

9. Before agreeing to take over ONE Aviation, I specifically raised with Mr. Buck, Mr. Biran, Mr. Clark, Mr. Governali, and Mr. Wyse—on multiple occasions—my concerns regarding the tremendous risks involved given creditor actions, extreme attrition, negative market perception, and cash flow maintenance. DW and Crystal wanted to keep the company as attractive to Citiking (a potential acquirer of DW's and Crystal's SSL positions) as possible. I made it clear that I would only take over as COO if I had full executive authority over company operations and did not report to the titular CEO, Alan Klapmeier. Wyse, DW, and Crystal agreed to my terms and issued me a seat on the Board of Directors, to which I reported. DW and Crystal reassured me that they had sufficient Board seats to maintain my status of reporting directly to the Board and not Mr. Klapmeier. Likewise, DW and Crystal negotiated to have my compensation be heavily weighted towards the goals of the SSLs—achieving financial stability of the company

and a profitable buyout of their debt position. My escalating "Transaction Bonus" or "Success Fee" would be determined by the amount at which the SSLs sold their debt.

10. Mike Wyse actively participated in executive management of the company beyond his role as Chairman of the Board of Directors and regularly gave me directions or objectives to achieve and instructions on how to run the company. During the time I lived in Albuquerque, Mr. Wyse traveled to Albuquerque 4-6 times for business meetings with me and with the Board of Directors. Our in-person conversations in Albuquerque included discussions of my bonus and reassurances from Mr. Wyse that he, DW Partners, and Crystal would take care of me. I estimate that we spoke on the telephone 2-3 times per week, and that we also exchanged hundreds of text messages.

11. The specific role Mr. Wyse served in each of our interactions was blurred by the fact that he was attempting to act as the Chairman of the Board of Directors, the functional equivalent of a company executive, and also as someone overseeing the investments of the secured lenders. A primary example of Mr. Wyse acting in a way that blurred the lines of his role was when he single-handedly undertook direct negotiations with the landlord at Chicago Executive Airport to settle arrearages on our month-to-month lease there. Mr. Wyse bound the company to pay all amounts due (approximately $80,000) with no assurance we could remain in possession of the property, and after payment we were in fact evicted.

12. John Buck of DW Partners also actively participated in executive management of the company, beyond his role as a senior secured lender during my year in Albuquerque. I spoke with Mr. Buck an estimated 50 times during the year I lived in Albuquerque, and we exchanged around 100 text messages. Beyond overseeing DW Partners' investment,

Mr. Buck frequently gave me directives and objectives to achieve and instructions on how to run the company. Mr. Buck traveled to Albuquerque at least once in 2015. Mr. Buck also traveled to Albuquerque at least once in 2018 to meet with me and others on ONE Aviation/Eclipse Aerospace. During our one-on-one meetings in Albuquerque in 2018, we discussed my compensation. Mr. Buck, like Mr. Wyse, reassured me that DW Partners, Crystal Financial, and Wyse Advisors would take care of me. At one point during the negotiations, Mr. Wyse and Mr. Buck told me that the Senior Secured Lenders needed someone in the company to tell them what is going on, to steer things how they wanted them steered, and that was my job.

13. During my time in Albuquerque, I also regularly interacted with Joel Biran, Managing Principal at DW Partners by phone, email, and text message. Mr. Biran frequently sought information about the Albuquerque-based business and its operations and also gave me instructions and tasks to complete in Albuquerque and report back on.

14. In November 2017, Citiking International, a Chinese company, paid approximately $23 million for 50% of ONE Aviation's senior secured debt, including the full 25% owned by Crystal Financial and 25% of the 75% total owned by DW, with an agreement to buy out the remaining 50% from DW at some point in the future. Huan Wang, an executive of Citiking, also visited Albuquerque during my time there, as did Kieran McGarrell, the interim CFO employed by Traverse LLC, an accounting firm which was hired by the company to provide accounting services.

15. During my time in Albuquerque, ONE Aviation was insolvent and operating at a continual deficit as the Senior Secured Lenders (SSL's) attempted to find new investors

who would buy out their position and take the company through a Chapter 11
bankruptcy.

16. Below are additional in person or other important interactions with the individuals
discussed above—although by no means does this list include all of interactions with the
relevant parties:

    a.  I met with John Buck in Albuquerque on Wednesday, March 25, 2015, at 7:30am
at the Sheraton for breakfast. He was evaluating a potential transaction involving
Eclipse Aerospace and had requested that I provide advice. We then proceeded to
a day-long meeting at Eclipse headquarters involving Alan Klapmeier and others
where we discussed the potential combination of Kestrel with Eclipse to form
ONE Aviation. John had been staying in Albuquerque since Monday, working on
the potential transaction.

    b.  On August 8, 2017, at 6:15am I had a phone call with John Buck who described
Eclipse and ONE Aviation's financial problems which he blamed on Alan
Klapmeier. He said DW was preparing to have the company file chapter 11 and
asked if I would assist them in managing the company through that process and
after. At 8:25am, John Buck sent me a 25 page informational packet prepared for
use with potential note purchasers which described Eclipse Aerospace and the
opportunity to purchase its debt position. Later that day I executed a
Confidentiality Agreement with Crystal Financial as Administrative Agent,
Collateral Agent and Lender for Eclipse.

c.  In an email dated August 9, 2017, at 4:48pm, John Buck, in response to my questions about how my transaction bonus would work, stated "Sell bonus is not at all a problem. Happens all the time."

d.  On August 11, 2017, at 10:00am I had a phone call with Matt Governali and Mike Pizette of Crystal Financial regarding my background as an aviation and aerospace executive, and the opportunity to assist them in helping salvage some value from their investment in Eclipse.  Matt Governali stated "we know we may never get more than $20,000,000 for the business."

e.  On August 14, 2017, I signed an Independent Contractor agreement with Crystal Financial to provide consulting services for $300 per hour.

f.  On August 14, 2017, at 2:30pm, I had a phone call with Mike Wyse who had recently been appointed to the boards of directors of ONE Aviation and Eclipse Aerospace.  We discussed my background as an aviation executive and the current situation at Eclipse.  He stated he had worked with distressed companies for 20 years, was a friend of John Buck and that John had asked him to join the boards of ONE Aviation and Eclipse.  Mike stated they planned to file the companies into bankruptcy within 60 days, then run through the bankruptcy process for 90-100 days.  The current CEO was to leave, and I would be hired to take his place.

g.  On August 15, 2017, at 8:11am, Matt Governali sent me an executed copy of the consulting agreement negotiated with Crystal Financial and DW Partners.  Earlier in the email string, John Buck approved of the agreement and explained that "Crystal as agent is going to formally contract with you."

h.  At 9:30am on August 15, 2017, I had a call with Mike Wyse, Joel Biran, Albert
    Altro (Traverse), Kieran McGarrell (Traverse) and Matt Governali to discuss their
    short term operating plans for Eclipse including a layoff and a revised facilities
    plan.

i.  On August 16, 2017, at 1:15pm, I had a phone call with Matt Governali and
    Kieran McGarrell regarding plans to layoff a majority of the workforce, how to
    manage the company while in bankruptcy and what their strategic plan should be
    for managing the company post-bankruptcy.

j.  On August 24, 2017, at 12:20pm, I had a phone call with John Buck who stated
    Alan Klapmeier had wanted to sell the company's Chicago service center to Ken
    Ross, but that John said "no." John stated he thought the company was "way
    overstaffed" and wanted to know how much cash would be required to get the
    company back on its feet.

k.  On August 30, 2017, at 10:30am I had a phone call with Matt Governali and
    another individual at Crystal Financial to discuss the post-auction plan for
    managing the company and what the strategy would be.

l.  In an email dated September 20, 2017, at 9:08am, John Buck of DW Partners sent
    me a spreadsheet entitled "Eclipse 8-Week Cash Flow-09.27.17" containing a DIP
    budget that he approved of and stating that he would draft a press release to
    announce my hiring.  Earlier in that email string, Matt Governali of Crystal
    Financial requests a discussion with the interim CFO to go over the DIP budget.

m. Later that day, at 2:00pm on September 20, 2017, I had a call with Matt
Governali, John Buck, Joel Biran and Kieran McGarrell to go over my plan for
operating the company while it was in bankruptcy.

n. On September 21, 2017, at 6:38pm, John Buck sent me an email enclosing a draft
press release announcing my appointment as CEO and explaining that the EA700
program was being put on the back burner so the company could focus its
resources on supporting the existing owners of the EA500 and EA550 aircraft.

o. On September 26, 2017, at 12:00 noon, I spoke with John Buck by phone
regarding the lenders exercising "Cash Dominion" and a potential new lender.

p. On October 11, 2017, at 11:58am, John Buck sent an email to me, cc to Joel
Biran, suggesting changes to a document I had prepared outlining my evaluation
of the company and strategic plan for properly managing it in the future.  This
document was to be forwarded to Robert Clark prior to my telephonic meeting on
October 13 after which he would make the final decision on whether I should be
hired as the top executive of the company.  At 1:00pm on October 11, John, Joel
and I had a phone call to discuss the revised document.

q. On October 12, 2017, at 1:21pm, John Buck sent me an email with an attachment
showing me their plan for reducing the headcount of the company.  Most of the
128 jobs to be cut resided in New Mexico.

r. On October 12, 2017, I had a phone call with Mike Wyse who asked me to
consider becoming the CEO of Eclipse to replace Alan Klapmeier.  Mike
requested that I send him a resume and propose by noon the following day a

compensation package to contain both a salary and a "success" bonus. In response to the concerns I had repeatedly expressed to Mr. Wyse, Mr. Buck, and Mr. Governali about reporting to Klapmeier, Mr. Wyse stated I would also have a seat on the Board of Directors.

s.   On October 13, 2017, at 7:00am, I had a phone call with Robert Clark (Managing Director of DW), John Buck and Joel Biran regarding my views on how to maximize the value of Eclipse. The purpose of the call was to give Robert Clark an opportunity to interview me and make a final decision if I should be hired to run the company.

t.   At 9:50am on October 13, 2017, I had a phone call with John Buck who described Crystal Financial's approach to distressed situations and stated that the lenders had obtained 3 board seats which were occupied by Mike Wyse, one of which would be given to me if I joined as CEO.

u.   On October 13, 2017, at 7:13pm, John Buck texted me "That is a big ask" in response to my request for a signing bonus as a component of my compensation package. On October 14 he texted "…We don't have cash to pay a signing bonus." Then on October 18 he texted "Pigs get fat. Hogs get slaughtered. Signing bonus won't fly" and "Why are u being penny wise and pound foolish? Why is [the signing bonus] so important to you?"

v.   On October 16, 2017, at 4:35pm, in a phone call with Mike Wyse we discussed my request for a sign-on bonus which I characterized as usual & customary, and would be an expression of commitment by the lenders to bringing me onboard.

w. In an email dated October 17, 2017, at 2:33pm, Mike Wyse, in negotiating my compensation, stated "Our proposed compensation for your efforts would be....Transaction Bonus...Carve-out of your fees from Crystal / DW cash received."

x. In an email dated October 18, 2017, at 3:00pm, Mike Wyse confirmed acceptance of a 5-day long series of negotiations I had had with him and John Buck regarding the elements of my compensation package, and indicated that he would have an agreement prepared and "get HR on board" as an inducement to get me to begin work on October 23. These negotiations with Mike Wyse included a spreadsheet prepared by him entitled KG_Comp_101817 in which he detailed how the "Success / Transaction Bonus" would be calculated and stated it would be "considered a carve-out of cash received by Lenders."

y. In a phone call at 8:30am on October 19, 2017, with Matt Governali and Mike Pizette of Crystal Financial, they stated the company would file bankruptcy in 1-1.5 weeks to clean off the balance sheet which was favored by Crystal, and that they wanted me to prepare a 12-week projection of cash flows for the company.

z. On October 20, 2017, at 11:38am, Mike Wyse emailed me saying he would work on my employment contract over the weekend and that HR has been a little distracted, but that he had a template he would use.

aa. In a phone call with me at 10:20am on October 26, 2017, Mike Wyse promised to send me my employment agreement on that day or the next.

bb. On October 26, 2017, at 3:00pm, Mike Wyse presided over a telephonic Board of Directors meeting during which I was elected to the Board and potential sources of funding for the company were discussed.

cc. On October 27, 2017, at 6:18am, Matt Governali sent me an email terminating my consulting contract with Crystal now that I was hired by the company and requesting a phone call to discuss my first week on the job.

dd. In an email dated October 27, 2017, at 2:16pm, John Buck expressed his hope he would be able to obtain funding for the company to buy a certain part from L3 Aviation Products for airplane serial #1013 in its service center so the repairs could be completed, and payment could then be obtained from the customer. Earlier in that email chain, Matt Governali emails Mike Pizette from Crystal Financial and others requesting authorization to fund the request in Crystal's role as agent for the lenders to Eclipse.

ee. On October 27, 2017, at 5:38pm, Bob Brown, Director of Treasury Operations for Crystal Financial, emailed Kieran McGarrell, interim CFO of Eclipse, wire confirmation that the funding for the part purchase had been completed.

ff. In an email dated October 28, 2017, at 5:14am, John Buck acknowledged receipt of the report he had requested from me to relay progress by the board in developing an operating plan that would support efforts to find a lender to replace Crystal Financial.

gg. On October 31, 2017 and November 1, 2018, there was a two day, in-person Board of Directors meeting at company headquarters in Albuquerque. Mike

12

Wyse, Alan Klapmeier, and Jon Dwight were present, as was I. We covered a
wide variety of company issues ranging from potential sources of investment to
how to keep creditors at bay while continuing to operate the business. A list of 23
actions items resulted from the meetings.

hh. On November 1, 2017, at 6:05pm, I had a telephone conference with John Buck.
Mr. Buck told me that the SSLs would not fund ONE Aviation's profitable parts
business and suggested that we close the Chicago service center because it loses
money.

ii. On November 2, 2017, at 6:43am, I received an email from John Buck forwarding
a confirmation message from Matt Governali that CitiKing had delivered to
Crystal Financial $206,276.92 to be used to fund ONE Aviation operations.

jj. In an email dated November 2, 2017, at 11:20am, John Buck noted that Crystal
Financial had not yet sold their debt position, but that was expected to occur on
November 7.

kk. On November 4, 2017, at 10:45am, I received an email from Lynn Judge, HR
manager at Eclipse, stating that she had not heard back from Mike Wyse about
my employment agreement after having previously sent a draft to him.

ll. On November 13 at 8:03am I had a phone call with John Buck who explained that
Crystal Financial was sitting on $11.7 million they had received from the sale of
their debt position to CitiKing and that they were to "scoop out" $6m of it and
send the rest to DW. Mr. Buck also stated he had rewritten a press release I had

drafted and sent it on to Linda McDonough, the public relations firm he directed the company to use.

mm.     On November 15, 2017, at 5:56am, I received an email from Lynn Judge forwarding a draft of my employment agreement from Mike Wyse. Earlier in that email string, Mike Wyse requests that I make any desired changes to the document and that we could sign it when he arrived in Albuquerque the following day, November 16, 2017.

nn. On November 15, 2017, at 11:00am, I had a telephone conference with John Buck, Joel Biran, Kieran McGarrell regarding the 2018 budget. Mr. Buck stated that payroll was too high, directed me to find ways to lower it, and suggested we close the Chicago service center. The largest portion of our payroll went to employees working with me on the ground in Albuquerque. Mr. Biran directed us to break our P&L down into 4 categories: Sustaining, Catch up, New Aircraft Development, Restructuring and Other.

oo. On November 16, 2017, at 8:32am, Joel Biran emailed John Buck, Mike Wyse and me asking the steps remaining to obtain certification of the Eclipse aircraft in China and expressing his opinion that it would be worth the time and money for the company to do so.

pp. On November 16, 2017, at 9:00am, Mike Wyse presided over another in-person Board of Directors meeting at headquarters in Albuquerque. In attendance were board members Mike Wyse, Alan Klapmeier, Jon Dwight and me. Also in attendance were interim CFO Kieran McGarrell and former Eclipse President Ken

Ross.  The discussion focused primarily on ways to generate revenues, preserve cash and avoid negative impacts from creditor actions against certain subsidiaries.

qq.  In an email dated November 16, 2017, sent at 5:12pm and cc'd to John Buck and Mike Wyse, Joel Biran directed me to undertake Chinese certification of the EA550 aircraft after eliciting my advice on the issue.

rr.  On November 20, 2017, at 8:19am, Mike Wyse emailed to Lynn Judge the signature page of my employment agreement executed by him.

ss.  On November 29, 2017, at 9:30am, Mike Wyse presided over a Board of Directors telephonic meeting during which a 13-week cash budget was discussed and the priority of items to which the scarce cash should be allocated.

tt.  On November 30, 2017, at 7:00am, John Buck sent to me by email a financial model, indicating what our financial plan for ONE Aviation and Eclipse Aerospace should be for 2018.

uu.  On November 30, 2017, at 9:30am, Mike Wyse participated in a telephonic meeting of the members of the Board of Directors regarding the need to fund development of the new Eclipse 700 aircraft.  At 9:42am that day Mike Wyse presided over a telephonic review by the Board of the 13 week budget for the company.

vv.  On November 30, 2017, at 11:00am, I had a telephone conference with John Buck, Mike Wyse, Joel Biran, and Kieran McGarrell. The call was a 13-week budget review. Mr. Biran asked detailed and pointed questions regarding

operational budget items and stated that DW's investment committee needed to see the 2018 financial plan.

ww.     On December 4, 2017, at 12:30pm I had a phone call with John Buck and Kieran McGarrell to go over the 2018 operating budget, with Mr. Buck asking that payables data be analyzed differently and directing us to sell certain aircraft.

xx. On December 6, 2017, at 6:00am, Mike Wyse held a Board of Directors phone call to go over the 2018 budget.  Mr. Wyse stated the company would soon be receiving advice from its senior secured lenders on prospects for new investment.

yy. On December 6, 2017, at 9:00am, Mike Wyse participated in a telephone meeting with John Buck, Joel Biran, Kieran McGarrell and me to discuss the 2018 operating budget and receive DW's direction to break new product development expense out separately.

zz. On December 12, 2017, at 1:30pm, Mike Wyse held a Board of Directors telephone call with the company's attorneys, Chris Dickerson and Todd Schwartz. Mike Wyse stated that we needed to hire investment bankers to find a buyer for DW's senior secured debt.

aaa.     On December 13, 2017, at 6:29pm, I had a telephone conference with John Buck. Mr. Buck was calling to ask if an airplane sale had closed, and we also discussed the viability of a Garmin upgrade program.

bbb.     On December 18, 2017, at 12:30pm, Mike Wyse conducted a telephonic meeting with the Board of Directors, company attorneys Chris Dickerson and

Todd Schwartz, and Kieran McGarrell to discuss a forbearance agreement with the senior secured lenders and the potential buyout of them.

ccc.    On January 20, 2018, at 9:00am, Mike Wyse conducted a telephonic meeting with board members, and Vin Batra and Matt Gates from Duff & Phelps, the newly-hired investment bank. Topics discussed included marketing the company for sale as well as operational and cash management issues.

ddd.    On January 31, 2018, at 3:30pm Mike Wyse presided over a Board of Directors call (less Alan Klapmeier) with their investment bankers and lawyers to discuss the status of their marketing efforts. Subsequently, at 3:55pm, Mike Wyse presided over a second call without the investment bankers during which Mike pointed out that Alan was talking directly to investors and to that extent he could be considered a "participant" in the bidding process.

eee.    On February 6, 2018, at 8:45am, I had a face-to-face meeting with Michael Wyse, John Buck, and Huan Wang at company headquarters in Albuquerque. We engaged in extensive discussions regarding future plans for the company, Mr. Wang received a demonstration flight in a company EA500 aircraft, and we had a group lunch at Scalo. I gave John Buck and Huan Wang a ride in my car to lunch; Mr. Buck did not like the way I drove. All three individuals gave me directions on how to run the company, including the relatively mundane task of hiring janitors to clean the company bathrooms, thanked me for my work, and reassured me regarding my bonus.

fff. On February 7, 2018, at 9:00am, Mike Wyse held a call with Jon Dwight, Todd Schwartz, Vin Batra and me to discuss the lack of interest from potential purchasers.

ggg.    On February 10, 2018, at 5:00pm, Mike Wyse held a call with the board, the investment bankers and company attorneys to discuss the waning interest from several potential bidders.

hhh.    On February 12, 2018, at 3:00pm, Mike Wyse held another call with the board, the investment bankers and company lawyers to discuss potential interest of Citiking investing in ONE Aviation. The next day at 5:30pm, Mike Wyse held a similar call with the same groups in attendance to further discuss Citiking and another possible investor, Emerald. The day after that at 8:30am, Mike Wyse held yet another call on the same topic with the same group.

iii. On February 14, 2018, at 10:30, Mike Wyse spoke to me by phone about getting my bonus paid. He assured me John Buck had agreed to it and said he could dig out an email in which Buck stated I would be paid.

jjj. In February 2018, the company was evicted from its premises at Chicago Executive Airport after Mr. Wise undertook direct negotiations with the landlord to settle arrearages on our month-to-month lease there. Mr. Wyse had agreed to pay all amounts due, with no assurance we could remain in possession of the property. After payment was made, we were evicted and had to scramble to quickly move our operations to a neighboring airport. This management error was outside the scope of his duties as Chairman of the Board and caused the company to incur significant expense and disruption.

kkk.     On February 20, 2018, at 8:03am, Mike Wyse hosted a phone meeting with board members, company lawyers and the investment banker to discuss strategic options for selling the company and dealing with certain interested parties.  Two days later Mike Wyse hosted a similar meeting with the same participants on the same topics. Also , in a text string beginning at 1:25pm on February 20, 2018, I asked Mike Wyse if he had talked to John Buck about getting my Transaction Bonus paid under my employment agreement.  Mike related that John said not to worry and that Mike had spoken to the company attorney Todd Schwartz and that they would work it out.

lll. On March 1, 2018, at 1:53pm I spoke with Mike Wyse by phone regarding payment of my bonus.  He assured me he would take care of it.

mmm.     On March 2, 2018, at 7:00am, Mike Wyse conducted a phone meeting with board members, company attorneys and the investment bankers regarding cash flows and potential investors.

nnn.     On March 2, 2018, at 8:00am, John Buck spoke with me by phone regarding calculation of my bonus amount and suggesting different methods by which it might be paid.  At 2:54pm later that day, John Buck texted that he was following up with Mike Wyse on his "supportive thoughts re our conversation."

ooo.     On March 6, 2018, Mike Wyse met with me at company headquarters in Albuquerque during which we discussed the process by which a bankruptcy filing would occur and indicating he wanted me to act as the representative for the company.  He also stated my bonus could be paid as a carve out in the Debtor-In-Possession financing.

ppp.     On March 7, 2018, at 3:50pm, Mike Wyse told me in a phone call that the
         SSL would not fund our DIP budget with the current payroll.

qqq.     On March 7, 2018, at 3:55pm, by telephone John Buck directed me to
         eliminate Project Canada, a new aircraft development program, to retain the
         existing GSE program, and to keep our CAAC certification program.

rrr. On March 8, 2018, at 10:00am, Mike Wyse hosted a telephonic meeting between
     the two senior secured lenders, each holding 50% of the debt, and representatives
     of the company and its investment bank.  In attendance were Mike Wyse, John
     Buck, Joel Biran, Huan Wang, Vin Batra, Kieran McGarrell and me.  The two
     SSL's argued about how quickly the company should move towards a chapter 11
     filing and what size DIP budget would be acceptable.  The meeting ended with no
     discernable agreement.  At 2:00pm that same day, Mike Wyse hosted a second
     telephonic meeting, this time with the board members and the company's
     attorneys and investment banker, but not the SSL's.  The board members
     expressed their frustration at the SSL's inability to agree and concern regarding
     making payroll the following week.  Then at 2:48pm John Buck called me to let
     me know he thought the other SSL was in agreement with DW on filing
     bankruptcy and that he would make sure the company received enough funding to
     make payroll next week.

sss. On March 8, 2018, at 3:33pm, Mike Wyse texted me to suggest that company
     lawyer Todd Schwartz should move my employment agreement from ONE
     Aviation to Eclipse which he had said was important to facilitate my bonus during
     the bankruptcy proceedings.

ttt.   On March 12, 2018, at 8:00am, Mike Wyse held a meeting of the board of directors, company attorneys and investment banker to discuss the disagreement between the SSL's and payment of my bonus which was noted would come out of the payment to DW but would be shown on the budget as a $1.473 million employee-related "Success Fee" payment in the DIP.

uuu.   On March 12, 2018, at 10:00am, Mike Wyse hosted a telephonic meeting with John Buck, Joel Biran, Huan Wang, Kieran McGarrell, Vin Batra, and Jon Stapleton regarding the cash crunch at the company and what would be acceptable as a DIP budget.  Joel Biran objected to the headcount remaining the same but Mike Wyse countering that it preserves optionality.  John Buck stated the Chicago area service center should be abandoned, but I countered that it would be difficult to later restart.  I brought up payment of my success fee, to which Joel Biran said "we need to discuss," which in the context of the conversation was an acknowledgement that it needed to be paid.

vvv.   On March 15, 2018, at 7:00am I had a phone call with Mike Wyse and Kieran McGarrell regarding cash scarcity, DIP budget and timeline for filing bankruptcy.

www.   On March 16, 2018, at 2:00pm, I spoke with Joel Biran, Michael Wyse, Kieran McGarrell, and John Stapleton by telephone. Mr. Biran directing me to slim down the Garmin program. All five of us discussed how my $1.4 million success fee payment would be calculated in the event of a credit bid. Joel Biran (DW) specifically said something to the effect of, "How do we calculate Kevin's $1.4 million in the event of a credit bid?"

xxx.   On March 16, 2018, at 4:00pm, Mike Wyse hosted a telephonic meeting with board members, lawyers and Kieran McGarrell to discuss cash flow problems and bankruptcy filing.

yyy.   On March 18, 2018, at 11:45am, Mike Wyse held a board of directors meeting with company attorneys in attendance to discuss DIP funding, employment levels, and alternate business plans.

zzz.   On March 18, 2018, at 2:28pm, by telephone Joel Biran directed me to scale back the full Garmin program and retain the service center business. The next day at 4:29pm Joel Biran called me again to ask whether CitiKing was responding to the DIP proposal.

aaaa.   On March 27, 2018, at 4:00pm, Mike Wyse held a board of directors meeting to discuss cash flow problems, threatened creditor actions and attrition.

bbbb.   On March 29, 2018, at 10:00am, Mike Wyse in a phone call with me discussed legal strategies for blocking the sale of a company aircraft that had been seized by the Bernalillo County Sheriff on behalf of a creditor judgment. Later, at 3:12pm that same day, Mike Wyse told me by phone that the SSL's were negotiating to agree on a path forward into bankruptcy.

cccc.   On April 2, 2018, at 9:08am, Joel Biran called to discuss CitiKing's warming to the idea of taking the company through bankruptcy if an acceptable DIP budget is submitted. Mr. Biran directed me to eliminate certain jobs that were not necessary to the future of the company.

dddd.     On April 2, 2018, at 12:15pm, Mike Wyse held a call with the board of
directors and company lawyers to discuss progress with the SSL's agreeing to a
DIP budget and filing a "pre-pack" bankruptcy.

eeee.     On April 4, 2018, at 8:45am, Mike Wyse convened a telephonic meeting
of the board with the company attorneys and investment banker to discuss how to
make payroll and status of discussions with the SSL's.

ffff.     On April 8, 2018, at 2:00pm, Mike Wyse hosted a telephone call with
members of the board, company attorneys and investment banker to discuss lack
of SSL progress, other investors and cash flow challenges.  At 6:00am the next
day, Mike Wyse hosted a similar phone call with the same players plus Kieran
McGarrell to discuss strategy of shrinking the company to just a service only
business.

gggg.     On April 10, 2018, at 2:00pm, Mike Wyse convened a telephonic meeting
of board members, company lawyers, a representative of CitiKing and their
lawyer to extensively discuss bankruptcy alternatives and processes (363 v. pre-
pack v. out of court) and CitiKing's plan for the future.

hhhh.     On April 11, 2018, at 9:30am, Mike Wyse held a meeting with company
lawyers, investment banker and Kieran McGarrell to report on a conversation
with the largest junior lender.  At 10:30am that same day, Mike Wyse reconvened
the same group to compare a 363 v. a pre-pack and the potential for filing
bankruptcy.

iiii. On April 16, 2018, at 9:00am, Mike Wyse convened a meeting of the board with company attorneys and investment banker to obtain forbearance funding and remove certain non-participating members of the board of directors who were still on the record from prior leadership.

jjjj. In April 2018, the City of Albuquerque served an eviction notice on ONE Aviation due to arrearages in its lease obligations for facilities at the airport. I requested a meeting with the City Attorney to resolve the matter and retain the company's ability to occupy the premises. The meeting took place at 8:00am on May 15, 2018, in the City Attorney's office, and present were Esteban A. Aguilar Jr., the City Attorney, Nyika Allen, Director of Aviation. Mike Wyse insisted that he be included in that meeting by phone. We dialed Mr. Wyse in and he actively participated in the discussion.

kkkk.    After we reached an agreement with the City, Michael Wyse issued a statement on behalf of ONE Aviation. The Albuquerque Journal quote appears below:

- *"We have acquired new investors who want to stabilize our core business," said One Aviation board Chairman Mike Wyse in the letter. "Our goal is to remain at the Albuquerque International Sunport and be a long-term partner with the city."*

- https://www.abqjournal.com/1173311/city-serves-eviction-notice-on-eclipse.html

24

llll. After we reached an agreement with the City, on April 20, 2018, at 4:23pm, Huan

Wang directed me by telephone to restart production of the EA550 aircraft and

hire the people necessary to accomplish it.

mmmm.    On April 23, 2018, at 11:55am, John Buck told me over the phone that

DW was "in it for the duration" and that "we and you (meaning me) have a

chance to make a lot of money." John indicated he wanted me to be the company

representative in the first day motions of the bankruptcy proceedings.

nnnn.    On April 23, 2018, at 1:00pm, Mike Wyse conducted a telephonic board

of directors meeting where cash flow, SSL agreement and bankruptcy filing were

discussed. One board member brought up the possibility of equitable

subordination being raised against DW Partners. The board also approved my

signing the lease of the new facilities at Aurora airport in the Chicago area.

oooo.    On April 25, 2018, at 10:30am, John Buck directed me to use his PR

person, Linda McDonough to develop a communication plan to announce the

departure of Alan Klapmeier as CEO and the company's filing of bankruptcy.

Later that same day, at 1:25pm, John Buck and Joel Biran stated in a phone call

the board should keep Alan Klapmeier on as the titular CEO.

pppp.    On April 28, 2018, at 1:00pm, Mike Wyse convened a meeting of the

board members and the company attorneys to the noticed Bernalillo County

Sheriff's sale of the seized company airplane and the risk of other pending

creditor actions.

qqqq.     On May 1, 2018, at 3:30pm, Mike Wyse conducted a meeting of the board

of directors and company attorneys to discuss creditor actions, short term cash

flow and plans for filing bankruptcy.

rrrr.      On May 9, 2018, at 4:30pm, Mike Wyse held a telephonic meeting of the

board of directors and company attorneys to discuss the plan to file bankruptcy on

May 18 and communication plan around it.

ssss.     On May 15, 2018, at 2:00pm, I had a telephone conference with John

Buck, Joel Biran, and Michael Wyse in which Mr. Biran directed me to negotiate

a payment plan or amount with the city regarding the airport lease eviction notice.

tttt. On May 17, 2018, at 6:30am, Mike Wyse held a telephonic meeting of the board

of directors and company attorneys to discuss filing for bankruptcy and settling

the eviction notice with the city of Albuquerque.

uuuu.    On May 20, 2018, at 3:00pm, I had a telephone conference with Michael

Wyse, Huan Wang, Joel Biran, and Kieran McGarrell. They instructed me to

provide them with the list of names of individuals to be terminated in upcoming,

planned layoff. I was also directed to retain certain individuals.

vvvv.    On May 25, 2018, at 11:48am, I had a phone conversation with John Buck

where he said the SSL's were offering to pay the city of Albuquerque half of the

past due rent today and half next Tuesday.

wwww.    On May 29, 2018, at 7:35pm, I had a telephone conference with Huan

Wang and the CEO of Citiking, in which Mr. Wang asked detailed questions

about the future strategy of the company, committed to provide financial support,

and suggested that we file for bankruptcy with a bold budget for post-bankruptcy operations because Citiking would fund it.

xxxx.     On May 30, 2018, at 4:45pm, Mike Wyse held a telephonic meeting of the board and company attorney to discuss the continued feuding between the SSL's and the company's plan for filing bankruptcy.

yyyy.     On May 31, 2018, at 11:30am, Mr. Wyse and I had a telephone conference with representatives from EJOPA (a customer ownership group). Mr. Wyse reassured the customers by explaining how we would be dealing with parts shortages hiring additional employees.

zzzz.     On June 18, 2018, at 12:00pm, Mike Wyse held a telephonic board meeting which included the company lawyers to discuss the SSLs' failure to come to an agreement, current cash flow problems and threatened actions by creditors. Two days later at 3:00pm, another meeting was held with the same participants on the same topics, with the additional cash challenge of paying delinquent Franchise Taxes.

aaaaa.     On June 22, 2018, at 8:00am, I had a phone call with John Buck regarding payment of my bonus. He stated he agreed with the original intent of my employment agreement that as the SSL's realize more gain on their investment, they would share those gains with me. He stated the key to my getting paid was Mike Wyse and that I should convince him that I am willing to quit unless I get paid.

bbbbb.     On June 27, 2018, at 4:03pm, Mike Wyse convened a meeting of the

board and company attorneys to discuss the closing of an agreement between the

SSL's and that I should draft a letter from the company to the agent for the SSL's

requesting immediate funding or we will file for bankruptcy.  The following day I

drafted and sent that letter.

ccccc.     On July 5, 2018, at 9:30am, Mike Wyse convened a meeting of the board

and its attorneys to discuss requesting funding from the SSL's.

ddddd.     In an email dated July 10, 2018, at 1:07pm, CFO Kieran McGarrell sent

Mike Wyse and me a copy of the latest DIP budget showing my $915,000

"Employee success fee" would be paid as part of the bankruptcy proceedings.

eeeee.     On July 12, 2018, at 6:30am, I had a phone call with Mike Wyse regarding

payment of my bonus. Section 3(a) of my employment contract states, "The

Bonuses shall be based on all receipts of cash by the Senior Secured Lenders." A

cash buyout of the SSLs is what Mr. Wyse, Mr. Buck, and I envisioned when we

negotiated my agreement. Then as circumstances developed over the ensuing 8

months, it appears CitiKing paid cash for half of the 50% debt position and issued

some form of note for the second half of that 50% debt position. I asked Mr.

Wyse how we were going to handle the matter, and his response was that I should

be paid on the full consideration (meaning the cash plus the note) because at the

time we negotiated my contract, we could not have foreseen the debt purchase

being structured in this way. Mr. Wyse told me that he had spoken with the

company attorneys about the best way to get my bonus paid.

fffff.    On July 12, 2018, at 10:05am, Huan Wang stated in a phone call he was not wanting to fund payments on the company's legal fees and asking for details on how the company spent money.

ggggg.    On July 23, 2018, at 4:00pm, Mike Wyse convened a meeting of the board of directors and the company attorney to review cash flows and move to replace interim CFO.

hhhhh.    On July 31, 2018, Mike Wyse traveled to Albuquerque for ONE Aviation company business.  I picked him up at ABQ airport at 8:30am.  He stayed in ABQ overnight and continued attending to company business the next day.

iiiii.    In the course of a text stream with Mike Wyse on August 2, 2018, I expressed my frustration over still having not been paid my bonus, or getting reasonable assurances it would get paid, and threatened to quit.  Mike asked me not to take any action yet and stated "if I controlled the purse strings, you would have your money already."  He then asked if I would take something less, like $500,000, which I refused.

jjjjj.    On August 7, 2018, Mike Wyse traveled to Albuquerque to attend company business.  I picked him up at ABQ airport and brought him to the Eclipse headquarters.

kkkkk.    On August 16, 2018, at 10:15am, I had a telephone conference with Mr. Wyse, Mr. Wang, and Alan Klapmeier, the titular CEO. I was directed to make specific budget cuts in professional fees and subsidiaries' tax bills.

lllll.      On August 22, 2018, at 10:30am, Mike Wyse convened a telephonic meeting of the board of directors and its attorneys to make final preparations for filing of bankruptcy.

mmmmm. On August 27, 2018, at 2:00pm, Mike Wyse held a board of directors meeting with company attorneys in attendance to discuss final preparations for filing bankruptcy.

nnnnn.     On September 10, 2018, at 4:00pm, Mike Wyse conducted a telephonic board of directors meeting to plan filing of bankruptcy before completely out of money.

ooooo.     On September 17, 2018, at 3:00pm, Mike Wyse held a telephonic board meeting with company attorneys to discuss tax liabilities and SSL's refusal of last week's funding request.  Also discussed was junior creditors' likely actions once filing is made.

ppppp.     On September 19, 2018, at 12:00pm, Mike Wyse held a telephonic board meeting to discuss SSL's objection to level of professional fees in the DIP budget.

17. Beyond operating the company and keeping it alive to yield a financial gain for DW and Crystal, my efforts provided many benefits to DW, Crystal, and Mr. Wyse, including but not limited to:

   a.   Carefully managing cash to minimize outflows only to lifeline items and expenditures required to keep the EA700 program alive.

   b.   Keeping the spare parts and maintenance business lines healthy to provide a significant stream of revenue for the company.

c. Providing leadership and counseling (and hope) to the remaining 70 employees of the company to stem attrition and incentivize full effort.

d. Collecting all pending judgments against the company and undertaking negotiations to forestall legal actions against the assets of the company.

e. Managing Sheriff's seizures on three occasions to take only assets not critical to the ongoing spare parts operations, based entirely in Albuquerque, and the maintenance business lines, run from Albuquerque with a sub-unit in Illinois.

f. Convincing suppliers to continue providing needed parts even though ONE Aviations' accounts were delinquent.

g. Fending off threats from creditors and collection agencies, including harassing calls made to employees, to me, and to my wife.

h. Persuading landlords to allow us to remain in possession of the premises even though the rents were months past due (almost a year in some cases).

i. Convincing the storage firm not to scrap millions of dollars of irreplaceable tooling required for future production of aircraft even though storage fees had not been paid for years.

j. Continually preparing ONE Aviation for a Chapter 11 bankruptcy filing as DW and Crystal worked to finalize their deal with Citiking.

k. Keeping the titular CEO in check as he continually pushed the boundaries of the Board and his position, including his attempts to direct my management team and insist that we pay non-critical bills.

l.  Managing delinquent tax positions with several tax authorities, including Bernalillo County, to avoid enforcement efforts. I also spoke directly with the Bernalillo County Treasurer regarding unpaid taxes.

m.  Managing delinquent accounts with utilities and communications providers to avoid further disruptions in service.

I declare under penalty of perjury that the foregoing is true and correct.

_____
KEVIN GOULD

_____
6.7.21
DATE