IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

KEVIN GOULD,

    Plaintiff,

v.                                                        No. 1:19-cv-00382 WJ/JFR

MICHAEL WYSE,
WYSE ADVISORS, LLC,
DW PARTNERS, and
CRYSTAL FINANCIAL,

    Defendants.

## AMENDED COMPLAINT FOR DAMAGES

Plaintiff, Kevin Gould, through his undersigned counsel, and pursuant to New Mexico law, hereby states the following facts in support of his Amended Complaint for Damages:

## PARTIES

1. Plaintiff lived in Albuquerque, New Mexico and served as the Chief Operating Officer ("COO") Of One Aviation, the parent company of Eclipse Aviation, from October 23, 2017 to December 19, 2018. At all times relevant to this complaint, Eclipse Aviation had a principal place of business in Albuquerque, New Mexico.

2. Defendant DW Partners, LP, at all relevant times, was a senior secured lender of Eclipse and is located in New York, New York.

3. Jurisdiction is properly before this Court according to 28 U.S.C. § 1332, as there is diversity of citizenship amongst the parties and this matter seeks more than $75,000.

4. Venue is proper in the District of New Mexico because a substantial part of the events or omissions giving rise to the claim occurred within the boundaries of the District of New Mexico.

**GENERAL ALLEGATIONS COMMON TO ALL COUNTS**

5. Plaintiff incorporates by reference all of the foregoing allegations as though fully set forth herein.

6. In 2015, Defendant, DW Partners became the Senior Secured Lender ("SSL") of ONE Aviation when it purchased the total value of Eclipse Aviation with Kestrel to form ONE Aviation.

7. Crystal Financial later became an additional SSL, when it purchased and held 25% of DW Partners' SSL position.

8. The SSL took these positions because they believed that Eclipse was undervalued, and that proper management would yield DW Partners and Crystal Financial a significant profit on their investment.

9. By the summer of 2017, however, ONE Aviation began to run out of money and faced declining revenues. Unpaid creditors and legal disputes led to a number of judgments against the company, and suppliers began cutting off materials needed for manufacturing, maintenance, and spare parts.

10. Recognizing Eclipse's need for industry expertise in running an airplane company and managing difficult financial and legal situations. Defendant, through the action of Crystal Financial and DW Partners' Managing Principal John Buck, turned to Plaintiff because he specializes in operating executive and board member roles in distressed/high change environments such as financial restructuring, turnarounds, startups, and restarts, which is why he was hired to be the COO of Eclipse.

11. In August of 2017, Eclipse was in dire financial trouble. Plaintiff was initially contacted by Crystal Financial and DW Partners, in their role as Senior Secured Lenders of Eclipse,

to consult with them regarding the preparation for possible departure of the existing CEO and anticipated Chapter 11 bankruptcy proceeding of Eclipse in an effort to turn the company's financially viability around.

12. John Buck, the Managing Principal of DW Partners, was the individual from DW Partners with whom Plaintiff interacted the most. Mr. Buck was also one of the primary individuals that communicated with Plaintiff regarding Eclipse Aviation, and he was involved with hiring Plaintiff, first as a consultant and then to be the COO of Eclipse Aviation. These communications included extensive communications regarding compensation.

13. For example, on August 9, 2017, John Buck, Managing Director of DW Partners, sent an email to Plaintiff with a redline of an agreement for consulting services, which outlined the details of Plaintiff acting as interim CEO of Eclipse.

14. The negotiations sought to have Plaintiff's compensation heavily weighted towards the goals of the SSLs, namely achieving financial stability of the company and a profitable buyout of their debt position by offering and negotiating a transaction bonus or success fee which would be determined by the amount at which the SSLs sold their Eclipse Aviation related debt.

15. The negotiations also included discussions of Plaintiff taking over the role of CEO of Eclipse Aviation.

16. The negotiations later evolved, with Defendant, through John Buck, and others asking Plaintiff to become the COO of Eclipse rather than take over the company as CEO because DW Partners and Crystal believed it would be better to keep Eclipse's then CEO on in a titular role. At the time, DW Partners and Crystal Financial communicated that they believed the current

CEO's marquee name in the industry might be helpful in attracting foreign buyers for their debt. Plaintiff, however, would have exclusive top executive authority to run the company.

17.     These negotiations included extensive conversations with DW, including with DW Partners Managing Principal John Buck, and Crystal Financial contemplating putting Eclipse into Chapter 11 bankruptcy in an attempt to turn the company around.

18.     Because of the intention to place the company into Chapter 11 bankruptcy, Plaintiff contacted Michael Wyse, who was a member of the Board of Directors of Eclipse, and who was working with DW Partners and Crystal Financial, on October 13, 2017, about his concern that bankruptcy would result in any unsecured creditor (which Plaintiff would be either as a consultant or as an employee of Eclipse) would likely have their contracts voided and receive pennies on the dollar (if that) in the event of an Eclipse bankruptcy.

19.     Plaintiff stated his contract needed to ensure both Crystal Financial and DW Partners guaranteed payment for his work, since Plaintiff's efforts to sell the loans primarily benefited Crystal Financial and DW Partners. Plaintiff initially requested a $360,000 annual salary as well as a $100,000 signing bonus, a 5% Success Fee and a year's salary as severance.

20.     During early negotiations, Plaintiff communicated that "it is going to be a very tough job with substantial risks at almost every step of the way". Buck responded by saying, "I agree but we don't have the cash to pay a signing bonus."

21.     Plaintiff also received a text message from John Buck from DW Partners, in response to his compensation demands, stating "Pigs get fat. Hogs get slaughtered. Signing bonus wont fly." A few text messages later, Buck also texted: "That is a big ask". Buck further texted

4

Plaintiff to give up his signing bonus request and entice him to accept a contract that offered a success/transaction fee.

22. These text messages make clear that DW Partners, through John Buck, participated in Plaintiff's written employment contract negotiations.

23. During negotiations as, *inter alia*, manager partner of Wyse Advisors, LLC, Michael Wyse made promises on behalf of, *inter alia,* both senior secured lenders Crystal Financial and DW Partners in a response emailed dated October 17, 2017. These promises included the following:

    a. As COO, Plaintiff would have complete control over the day-to-day activities of Eclipse and report directly to the Board of Directors;

    b. Plaintiff would become a member of the Board of Directors;

    c. Annual Salary of $330,000;

    d. Transaction Bonus (Value would be after new money and preferred return)

        e. 2% between $25MM and $30MM;

        f. 3% between $30MM and $35MM;

        g. 4% between $35MM and $40MM;

        h. 5% over $40MM.

24. This offer also noted that the transaction fee would be carved out from Crystal Financial and Defendant DW Partners.

25. After some back and forth on emails between Wyse and Plaintiff negotiating terms, Plaintiff sent an email to Wyse stating that he had just spoken to John Buck and believed everything regarding the negotiation was finalized with a few amended requests.

26. On October 18, 2018, Wyse responded to the October 17, 2017 email from Plaintiff by stating: "That will work. Thanks for working with us to get this done. Will draft the letter and get HR on board, after we get through tomorrow morning."

27. Although Plaintiff was to be officially employed by Eclipse, all parties understood that Plaintiff's role was to support efforts to secure a buyer for the loans held by the senior secured lenders, for the benefit of the senior secured lenders.

28. The senior secured lenders also made it clear to Plaintiff that they were, in effect, running Eclipse, and would only authorize cash expenditures if Eclipse officers and directors ran the company pursuant to the express direction of the senior secured lenders.

29. As previously discussed between Plaintiff, John Buck, and Michael Wyse, DW Partners and Crystal Financial successfully negotiated to have Plaintiff's compensation be heavily weighted towards the goals of the SSLs, achieving financially stability of the company and a profitable buyout of their debt positions by giving Plaintiff an escalating "Transaction Bonus" or "Success Fee," which would be determined by the amount at which the SSLs sold their debt.

30. Based upon this agreement—which included a transaction bonus or success fee guaranteed by Crystal Financial and DW Partners—Plaintiff moved from California to Albuquerque, NM and began working at Eclipse as the COO on October 23, 2017. Plaintiff made the move and began working without a written contract because he was told that it was important for Plaintiff to begin work on the turnaround right away, and because Plaintiff trusted that the secured lenders would keep their word regarding the promises they made.

31. After moving to New Mexico, and several requests to receive a contract in writing, Plaintiff signed a written contract in November of 2017. The contract stated that the employment agreement was made and entered into on October 23, 2017. The contract's place of performance

of Plaintiff's duties and responsibilities are in and from Albuquerque, New Mexico. The contract's compensation of Plaintiff is largely the same as the October 17, 2017 email; however, it states that the "transaction bonus will be carved-out from the proceeds available for distribution to the Senior Secured Lenders," instead of naming both lenders.

32. By virtue of his dual roles as representative for the senior secured lenders and Managing Principal of DW Partners, John Buck engaged in a pattern and practice of obfuscation wherein he refused to make clear whether he was speaking and acting on behalf of Eclipse, or on behalf of his own companies and the senior secured lenders.

33. This obfuscation was done intentionally or recklessly to induce Plaintiff to enter into the written contract with Eclipse, for the benefit of the senior secured lenders in order to leave Plaintiff with the impression (or misimpression) that the senior secured lenders would pay Plaintiff his bonuses should he successfully support efforts to find buyers for their loans.

34. Plaintiff held up his portion of the contract by competently running Eclipse and supporting efforts to find companies to purchase the secured loans from Crystal Financial and DW Partners. For example:

    a. On November 1, 2017, SFund International Holding Limited ("SFund") purchased 25% of Crystal Financial's secured loan for $6,250,000.00.

    b. On November 1, 2017, Citiking International US, LLC ("Citiking") purchased 25% of DW Partners secured loan for $6,250,000.00.

    c. On January 26, 2018, an airplane was sold for $1,000,000.00.

    d. And on July 10, 2018, SFund and Citiking agree to buy the remaining secured loan from DW Partners for $17,000,000.00.

    e. This combined total is a cumulative transaction of $30,500,000.00, which under the

terms of Plaintiff's contracts entitles him to approximately $915,000.00 in transaction bonuses. Plaintiff has not been paid these transaction bonuses despite promises along the way that Plaintiff would not be left "hanging."

35. Several months into working as COO, Plaintiff raised concerns that he was not receiving the carve-out from the transactions he had overseen. In response, he regularly received calls and texts from both John Buck and Michael Wyse ensuring that he would receive the bonus compensation owed to him.

36. On July 10, 2018, Plaintiff received two emails from interim CFO and Financial Advisor Kieran McGarrell with a spreadsheet showing his bonus calculation and the DIP budget showing a payment of a bonus going to Plaintiff. These emails note that the transactional bonus for Plaintiff is $915,000.

37. Plaintiff repeatedly reached out requesting clarity on when he would receive payment of his bonuses. To date he has not received any form of payment towards his bonus.

38. Based upon these actions, it has become clear that John Buck and DW Partners misrepresented to Plaintiff that his transaction fee would be paid and that it would be guaranteed by Crystal Financial and DW Partners.

39. This misrepresentation went so far as to explicitly state in a contract with Eclipse/ONE Aviation that the transaction fee would be carved out of any proceeds going to Crystal Financial or DW Partners if the debt or other assets were sold by the company.

40. As anticipated by Plaintiff and Defendant, including John Buck in his role as Managing Principal of DW Partners, Eclipse later filed for bankruptcy during which the disclosures expressly requested that Plaintiff's contract with Eclipse be voided.

41. At all times operative to the Complaint, Defendant has failed to act in good faith in

their dealings with Plaintiff. Their bad faith is motivated by intentional and negligent misrepresentation and greed.

## COUNT I-MISREPRESENTATION

42. The foregoing Paragraphs are incorporated by reference as if fully set forth herein.

43. As part of their interactions with Plaintiff, Defendant made a series of intentional and material misrepresentations and omissions, including the repeated promise that Plaintiff would receive the transaction bonus from the senior secured lenders, in exchange for the transactions Plaintiff oversaw and helped secure for the benefit of Defendant.

44. In the alternative, as part of their interactions with Plaintiff, Defendant made a series of negligent and material misrepresentations and omissions, including the repeated promise that Plaintiff would receive the transaction bonus from the senior secured lenders, in exchange for the transactions Plaintiff oversaw and helped secure for the benefit of Defendant.

45. Defendant intended for Plaintiff to rely on the material statements and omissions as part of his inducement into forming, and continued performance on behalf of Defendant, including finding buyers for Defendant's secured lender loans.

46. Plaintiff did in fact rely on these promises and performed his duties with the expectation that Defendant would honor its promises and pay Plaintiff the transaction bonus that Defendant continued to promise Plaintiff, in exchange for the transactions that Plaintiff assisted with, which benefited Defendant.

47. Defendant had no reasonable ground for believing that its statements about Plaintiff's compensation were true. Defendant at all material times know that it intended to leave Plaintiff "hanging" and not pay him his transaction bonuses.

48. In fact, Defendant promised Plaintiff that he would receive the transaction bonus

from Defendant, in exchange for the transactions he assisted with, to the benefit of Defendant, while knowing that Defendant never intended to honor the agreement.

49. As a result of Defendant's actions, Plaintiff has suffered damages, to include consequential damages, the loss of the transactional bonus of $915,000, expenses related to relocating to Albuquerque, and emotional distress.

50. Defendant's actions were willful, wanton and reckless such that an award of punitive damages is appropriate.

## COUNT II-UNJUST ENRICHMENT

51. Plaintiff honored his obligations with Defendant and through his efforts helped procure buyers for Defendant's loans to Eclipse.

52. Defendant has knowingly benefited from Plaintiff's efforts, at the expense of Plaintiff.

53. In fact, Defendant and the other SSLs benefitted by receiving $30,500,000 for the sale of their debt and other Eclipse assets, which resulted in a significant profit on Defendant's initial investment.

54. That profit and benefit was only possible because of Plaintiff's work, which was predicated upon Defendant's promise, made by Managing Principal John Buck, that Plaintiff would receive a transaction bonus or success fee that was guaranteed by the SSL's.

55. Defendant benefitted in a manner such that allowance of Defendant to retain the benefits of Plaintiff's work would be unjust.

56. Plaintiff has been damaged by Defendant's conduct, including the loss of his bonus, and consequential damages, in an amount to be determined at trial.

WHEREFORE, Plaintiff demands judgment from Defendant in an amount to be determined

by the jury, together with all costs, pre-and post-judgment inter4est, punitive damages, along with any other relief the Courts proper.

                                            Respectfully submitted,

                                            */s/ Nicholas T. Hart*
                                            Nicholas T. Hart
                                            Daniel J. Gallegos
                                            **HARRISON HART & DAVIS LLC**
                                            924 Park Ave SW, Ste E
                                            Albuquerque, NM 87102
                                            (505) 295-3261
                                            nick@harrisonhartlaw.com
                                            daniel@harrisonhartlaw.com

                                            *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

     I certify that Plaintiff's Amended Complaint was electronically filed with the United States District Court for the District of New Mexico's CM/ECF system on April 14, 2022, which served all parties as reflected in the Notice of Electronic Filing.

                                            */s/ Nicholas T. Hart*
                                            Nicholas T. Hart