IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**KEVIN GOULD**,

    Plaintiff,

    v.                                                                                         No. 1:19-cv-00382-WJ-JFR

**DW PARTNERS, LP**,

    Defendant.

### MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**THIS MATTER** comes before the Court upon Defendant DW Partners, LP's ("DW Partners") Motion for Summary Judgment (**Doc. 148**), Plaintiff Kevin Gould's ("Gould") Response (**Doc. 153**), and DW Partners' Reply (**Doc. 155**). Having reviewed the briefing, as well as the applicable law, the Court finds the Motion is well-taken and is hereby **GRANTED**.

### BACKGROUND

The Court has outlined the underlying facts in various other Memoranda Opinions and Orders. *See, e.g.,* **Docs. 51, 53, 54, 63, 103, 106**. They needn't be repeated at length here.

Back in 2017, One Aviation/Eclipse Aerospace was nearing bankruptcy. Gould—who had experience in leading struggling companies out of distressed financial circumstances—was hired as an executive. An employment contract was discussed, negotiated, and drafted between One Aviation and Gould. The contract was signed in the fall of 2017.

Under the employment contract, Gould agreed to serve as the Chief Operating Officer of Eclipse as well as a board member of One Aviation. He would receive a base salary of $330,000 per year. And a bonus was possible, as well. The contract's language states a transaction bonus

between 1–5% would be paid for transactions totaling more than $20 million. Of note, the transaction bonus was to "be carved-out from proceeds available for distribution to the Senior Secured Lenders." As will prove important later, the term "Senior Secured Lender" ("SSL") is not defined in the contract.

* * *

During Gould's employment, one transaction occurred. No transaction bonus was paid because the sale was only for $11.7 million in cash. After about a year, Gould went on vacation—and never returned to work at the Albuquerque office. Litigation then ensued.

Plaintiff originally filed suit against Michael Wyse, Wyse Advisors LLC, DW Partners, and Crystal Financial. **Doc. 1-1**. After a series of motions to dismiss, an appeal, and the filing of an Amended Complaint (**Doc. 55**), all that remains are Gould's claims against DW Partners for (1) negligent misrepresentation, and (2) unjust enrichment.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the moving party shows there is "no genuine dispute as to any material fact." *Cruz v. City of Deming*, 138 F. 4th 1257, 1265 (10th Cir. 2025) (quoting *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (quoting Fed. R. Civ. P. 56(a))); *see also Russillo v. Scarborough*, 935 F.2d 1167, 1170 (10th Cir. 1991). A material fact is one that "under the governing law . . . could influence the outcome of the lawsuit." *Mauldin v. Driscoll*, 136 F.4th 984, 993 (10th Cir. 2025). And "the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Est. of Beauford v. Mesa Cnty., Colo.*, 35 F.4th 1248, 1261 (10th Cir. 2022) (citation omitted).

If the movant demonstrates "the absence of a genuine issue of material fact," the burden shifts to "the non-movant to establish a genuine issue of fact." *Georgelas v. Desert Hill Ventures,*

*Inc.*, 45 F.4th 1193, 1197 (10th Cir. 2022); *see also Palzer v. CoxCom, LLC*, 833 F. App'x 192, 199 (10th Cir. 2020) (unpublished).

To defeat summary judgment, the nonmovant must set forth specific facts that would be admissible in evidence from which "a rational trier of fact could find for the nonmovant." *Williams v. Owners Ins. Co.*, 621 F. App'x 914, 917 (10th Cir. 2015) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)). But the nonmoving party cannot rest on mere allegations—instead they "must bring forward specific facts showing a genuine issue for trial." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citation omitted).

If the nonmovant does not dispute the movant's statement of undisputed facts, then those facts are deemed admitted (for purposes of the summary judgment motion). *See Walker v. City of Orem*, 451 F.3d 1139, 1155 (10th Cir. 2006); *Milam v. Pafford EMS*, 729 F. App'x 632, 636 (10th Cir. 2018) (unpublished). Likewise, "a complete failure of proof concerning an essential element of the nonmoving party's case" will entitle the movant to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

At this stage, the Court also "construe[s] the facts in the light most favorable to the nonmovant and . . . draw[s] all reasonable inferences in its favor." *Palacios v. Fortuna*, 61 F.4th 1248, 1256 (10th Cir. 2023) (quoting *Est. of Beauford*, 35 F.4th at 1261). The Court's function is not to "weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986); *see also Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1150 (10th Cir. 2005).

3

## UNDISPUTED MATERIAL FACTS[1]

The following facts are either not disputed[2] by Gould or, following the Court's review of the evidence and pleadings submitted, have been deemed undisputed or immaterial.

1. Plaintiff Gould is a businessman who served as a consultant or executive to several large corporations. **Doc. 148 ("UMF") at ¶ 2**.

2. Defendant DW Partners is an investment management company. **UMF at ¶ 3**. John Buck was an employee at DW Partners. *Id.* **at ¶ 13**. Initially, Gould and Buck had informal discussions about the Eclipse COO position and the compensation. *Id.* **at ¶¶ 16–23**.[3]

3. Gould formally negotiated the terms of his contract with Michael Wyse. **UMF at ¶¶ 13 & 16–20**. Wyse served on the board of One Aviation. *Id.* **at ¶ 11**. And Wyse Advisors, LLC, served as a financial consultant to One Aviation and Eclipse. *Id.*

4. On October 23, 2017, One Aviation sent Gould "loan documents" which contained the identities of the SSLs to Eclipse. **UMF at ¶ 21** (citing **Doc. 148-1 at 30–33**). DW Partners was not, nor has ever been, an SSL[4] to Eclipse Aerospace or One Aviation. *Id.* **at ¶ 5**. The SSLs to Eclipse and One Aviation were: (1) Pine, (2) Crystal, and (3) CitiKing. *Id.* **at ¶¶ 8–9 & 21**.

---

[1] For ease of reading, most references to supporting exhibits have been omitted.
[2] Gould does not dispute UMFs ¶¶ 2, 3, 4, 13, 14, 22, 24, 25, 26, 27, 28, 29, 32, 33, 34, 36, 38, 39, 40, 45, 54, 58. *See* **Doc. 153 at 2**. Although Gould did not "admit" to UMFs ¶¶ 11 & 37, he did not dispute them with a Response either. *Id.* **at 5 & 7**.

The "disputed" material facts are UMFs ¶¶ 5, 8, 9, 16–21, 23, 30, 31, 35, 37, 41, 42, 44, 46, 47, 51. *Id.* **at 2–9**. But Gould's pushback is either immaterial or not genuinely disputed. Rather, his Responses to the UMFs fail to "bring forward specific facts showing a genuine issue for trial," and instead merely levy arguments and allegations. *See Kannady*, 590 F.3d at 1169.

[3] Gould "disputes" that Buck was involved in the Eclipse negotiations. **Doc. 153 at 6**. In the next paragraph, though, Gould "does not dispute" that he negotiated with Buck. *Id.* Thus, Gould's "dispute" as to DW Partners' UMFs 16–21, 23, and 31 are inconsistent. Moreover, the admissible evidence shows that Gould told Wyse he did "not discuss money or terms of the employment contract with Mr. Buck." **UMF at ¶ 20** (citing **Doc. 148-1 at 23**). But even if Buck made promises or assurances to Gould, the actual contract negotiations for the One Aviation and Eclipse position were made through Wyse—not DW Partners. *See infra* at ¶¶ 6–9.

[4] Gould tries to dispute this fact—and argues that DW Partners was a "lender." **Doc. 153 at 2–3 & 7**; *see also* **AMF at ¶ A**. But being a "lender" is not the same as being a "Senior Secured Lender." *See infra* ¶ III.

5. Between August 14–November 18, 2017, Gould negotiated the terms of his employment contract. **UMF at ¶¶ 17–18**. Gould and Wyse went back and forth about compensation. *Id.* at **¶¶ 18–26**. A draft contract was sent, reviewed, and edited. *Id.* at **¶¶ 22–26**.

6. On November 20, 2017, the employment contract[5] between Gould and One Aviation was signed. **UMF at ¶¶ 25 & 26**. Gould agreed to serve as Chief Operating Officer of Eclipse[6] and a board member of One Aviation. *Id.* at ¶ 27.

7. The contract included various provisions, *see* **UMF at ¶¶ 27–39**, including a transaction bonus clause. *Id.* at **¶¶ 30 & 32–34**. The transaction bonus contained an antecedent condition—that is, Gould was not entitled to a bonus "until and unless the SSL[s] receive at least $20 million in cash for their interest in Eclipse." *Id.* at ¶ 30.[7] Additionally, the transaction bonus (if any) was to be "carved-out from proceeds available for distribution to the" SSLs. *Id.* at ¶ 32.

---

It is, therefore, undisputed that DW Partners was not a Senior Secured Lender. The fact DW Partners may have been a "lender" (albeit, junior or unsecured) is immaterial to resolving the dispute about what the phrase "Senior Secured Lender" means in the employment contract.

[5] The contract says it was "made and entered into as of the 23rd day of October, 2017 . . . between OAC Management Inc. . . . and Kevin Gould." **Doc. 148-1 at 40**.

But the contract wasn't signed until November. **UMF at ¶ 25**; **Doc. 153 at 2** ("not disput[ing]" fact 25). Although not at issue, a contract is not enforceable under New Mexico law until it's signed. *Cessna Fin. Corp. v. Mesilla Valley Flying Serv.*, 1969-NMSC-169, ¶ 9, 81 N.M. 10, 462 P.2d 144 (N.M. 1969) (citations omitted).

[6] The Court relies on the underlying contract for the position descriptions because, at times, the parties have swapped the COO and board roles. *See* **Doc. 148-1 at 40**.

For example, Gould's Amended Complaint alleges that he served as the "Chief Operating Officer . . . of One Aviation." **Doc. 55 at ¶ 1**. But in his Response, Gould says he was "the Chief Operating Officer of Eclipse." **Doc. 153 at 4**.

Much the same, DW Partners' alleges that Gould agreed to serve as the COO of One Aviation and a board member of Eclipse. **UMF at ¶ 27**. Later on, DW Partners says that Gould was the COO of Eclipse and a board member of One Aviation. **UMF at ¶ 50**.

[7] Gould "disputes that, for him to be entitled to any damages in this case, DW Partners LP had to receive more than $20 million in actual cash from CitiKing." **Doc. 153 (MF) at ¶ 30**. That's not what the undisputed material facts show. Nor is that what the contract says. Rather, the total aggregate receipts of cash amongst all SSLs—*i.e.*, Pine, Crystal, and CitiKing—needed to exceed $20 million. *See, e.g.,* **UMF at ¶ 30**; **Doc. 148-1 at 41 ¶¶ 3(a) & (b)**.

To the extent Gould tries to argue the paying-out of his bonus was based on cash and "cash-like obligations," **Doc. 153 at ¶ 30**, the Court finds otherwise. Under New Mexico law, unambiguous contract provisions are "applied, not interpreted." *Evanston Ins. Co. v. Desert State Life Mgmt.*, 56 F.4th 899, 908 (10th Cir. 2022) (citing cases); *see also* **Doc. 155 at 4 ¶ 30**.

8. Gould drafted this "carved out" language. **UMF at ¶ 33**. But the term SSL[8] is not defined in the contract. *Id.* **at ¶ 34**.

9. There were no other "representations, understandings, or agreements" between Gould and One Aviation. **UMF at ¶ 39**. The contract is "final, complete, and exclusive." ***Ibid.***; *see also id.* **at ¶ 40**. Moreover, the contract was jointly drafted by Gould and One Aviation. *Id.* **at ¶¶ 22–23**; *see also* **Doc. 148-1 at 44 ¶ 16** ("jointly drafted" provision); **Doc. 148-1 at 6** (Deposition).

10. In November 2017, two SSLs sold 25% of their interest to CitiKing for $11.7 million.[9] **UMF at ¶ 41**. This was the only transaction that occurred during Gould's employment wherein a SSL received any money. *Id.* **at ¶ 42**.

11. In 2018, CitiKing reneged on its agreement to pay the SSLs for the remaining 50% of Eclipse's debt. **UMF at ¶ 44**. Because of this action, Gould realized he was unlikely to receive a transaction bonus. *Id.*

12. Gould then spoke to John Buck and Michael Wyse—who also served as Eclipse's legal counsel—about his transaction bonus. **UMF at ¶ 44**. Gould told Wyse that because he wasn't going to receive a transaction bonus, he would be taking time off. *Id.* **at ¶ 45**. In August 2018,

---

[8] According to the parties' briefing, Gould viewed DW Partners as an SSL based on a previous employment contract Gould had with Crystal as an independent contractor. *See* **Doc. 153 at 7 ¶ 35** (citing **153 at 44–52**). Whether or not this view was "mistaken" is immaterial. The contract at issue here is between Gould and One Aviation. Before entering into the employment contract at issue, One Aviation sent Gould "loan documents" that contained all the identities of the SSLs to Eclipse. *See* **UMF at ¶ 21**; *see also* **Doc. 148-1 at 30–33**.
  The veracity of *what* Gould "thought" and *why* is not something the Court will consider. Moreover, the Court gives no weight to the other employment contract (with a different entity) when deciding whether DW Partners was an SSL to Eclipse. *See* **Doc. 155 at 6 ¶ AMF A**.

[9] Gould takes issue with the notion that DW Partner "only received $11.7 million." **Doc. 153 at 4**. Gould claims that DW entered into a purchase and sale agreement with CitiKing to sell over $20 million of its debt. *Id.* But again, this is immaterial. The terms of the contract focus on the transaction bonus to be paid as a percent of **cash** received by the SSLs. And as the undisputed material facts show, DW Partners was not an SSL. So even if "DW and Crystal entered into multiple contacts" totaling more than $28 million, *see* **Doc. 153 at 7 ¶ 44 & 48**, the contract's language makes clear that the "cash" received by the SSLs is what triggered the transaction bonus. *See* **UMF at ¶¶ 5, 8, 9, 21**.

Gould left Albuquerque and went "on vacation." *Id.* **at ¶ 46**. Gould never returned to work at the company. *Id.* **at ¶ 47**.

13. After leaving in August, Gould continued to receive a salary until he was terminated. **UMF at ¶ 51**.

14. On December 19, 2018, Gould was terminated as COO of Eclipse and as a board member of One Aviation. **UMF at ¶ 50**.

15. Gould claims he is entitled to a transaction bonus. **UMF at ¶ 58**. Specifically, Gould says he is due $915,000 based on the terms of his employment contract. *Id.* And both the Complaint and Amended Complaint allege that DW Partners promised Gould would receive a transaction bonus from the SSLs. *Id.* **at ¶¶ 59 & 60**.

16. Finally, the Court notes[10] that the contract is "governed by and construed in accordance with the laws of the State of New Mexico." **Doc. 148-1 at 44 ¶ 17**.

## DISCUSSION

Because this is a diversity case, the Court must apply New Mexico substantive law. *Geometwatch Corp. v. Behunin*, 38 F.4th 1183, 1201 (10th Cir. 2022) (Holmes, J.). Accordingly, the analysis below cites to New Mexico cases. As always, though, the federal summary judgment standards apply (because they are procedural). *Prager v. Campbell Cnty. Mem'l Hosp.*, 731 F.3d 1046, 1060 (10th Cir. 2013) (citing *Haberman v. Hartford Ins. Grp.*, 443 F.3d 1257, 1264 (10th Cir. 2006)). If (or when) case law from the federal courts is on-point—*i.e.*, when also applying New Mexico law—those cases are cited for additional support.

\* \* \*

---

[10] A district court can review materials adequately brought to its attention. *See Lazy S Ranch Props., LLC v. Valero Terminaling & Distrib. Co.*, 92 F.4th 1189, 1198 (10th Cir. 2024) (citing Fed. R. Civ. P. 56(c)(3)).

To begin: unambiguous contract provisions are "applied," not "construed or interpreted." *Richardson v. Farmers Ins. Co.*, 1991-NMSC-052, ¶ 7, 112 N.M. 73, 811 P.2d 571 (N.M. 1991) (citation omitted). And applying a contract does not allow a court to "alter or fabricate a new agreement." *Ponder v. State Farm Mut. Auto. Ins. Co.*, 2000-NMSC-033, at ¶ 11, 129 N.M. 698, 12 P.3d 960 (N.M. 2000). Rather, the contract's clear language controls. *Id.*; *see also Espinosa v. United of Omaha Life Ins. Co.*, 2006-NMCA-075, ¶ 26, 139 N.M. 691, 137 P.3d 631 (N.M. Ct. App. 2006) ("When a contract or agreement is unambiguous, we interpret the meaning of the document and the intent of the parties according to the clear language of the document, and we enforce the contract or agreement as written.").

## I. Negligent Misrepresentation (Count I)

To recover for negligent misrepresentation, Gould must show that: (1) DW Partners made a material misrepresentation of fact, (2) he reasonably or justifiably relied upon such representation, (3) DW Partners knew the representation was false at the time it was made or made it recklessly, and (4) DW Partners intended to induce Gould to rely on such representation. *Parker v. E.I. DuPont de Nemours & Co.*, 1995-NMCA-086, ¶ 44, 121 N.M. 120, 909 P.2d 1 (N.M. Ct. App. 1995). Additionally, to be liable for negligent misrepresentation, DW Partners must have breached a duty of disclosure owed to Gould. *Ruiz v. Garcia*, 1993-NMSC-009, ¶ 26, 115 N.M. 269, 850 P.2d 972 (N.M. 1993); *cf. Chavez v. Baca*, No. 04-cv-571, 2006 U.S. Dist. LEXIS 116248, at *10–11 (D.N.M. Mar. 29, 2006) (explaining negligent misrepresentation contemplates "a legal duty"). A duty of disclosure typically arises as the result of a special relationship between the parties (like a business transaction). *See R.A. Peck, Inc. v. Liberty Fed. Sav. Bank*, 1988-NMCA-111, ¶¶ 11–15, 108 N.M. 84, 766 P.2d 928 (N.M. Ct. App. 1988).

Gould admits that he engaged in contract negotiations with Wyse to work at One Aviation. *See* **UMFs at ¶¶ 16–26**. It is also uncontested that DW Partners did not employ Gould. This means DW Partners owed no duty to Gould. *See Vigil v. State Auditor's Off.*, 2005-NMCA-096, ¶ 22, 138 N.M. 63, 116 P.3d 854 (N.M. Ct. App. 2005). And Gould's knowledge that Buck worked for DW Partners—and not One Aviation—foreclosed any justifiable reliance upon any purported (mis)representations. This means Gould has no viable cause of action for negligent misrepresentation because he cannot satisfy the element of justifiable reliance as a matter of law.

The undisputed material facts also show that DW Partners did not promise Gould anything. In fact, Gould's employment contract explicitly states there are "no oral representations, understandings, or agreements" beyond the four corners of the agreement. **Doc. 148-1 at 43 ¶ 12**; *see Carrillo v. Rostro*, 1992-NMSC-054, ¶ 12, 114 N.M. 607, 845 P.2d 130 (N.M. 1992) (explaining "oral promises inconsistent with the written record" are unenforceable); *see also Macgregor v. MiMedx Grp., Inc.*, No. 19-cv-1189, 2021 U.S. Dist. LEXIS 94767, at *15 (D.N.M. May 18, 2021) (Kelly, J.) (explaining a party cannot reasonably rely upon oral statements by the opposing party in light of contrary written information). To the extent Gould alleges that Buck made specific material misrepresentations, extrinsic evidence that contradicts or supplements a written contract is barred under the "parol evidence rule." *C.R. Anthony Co. v. Loretto Mall Partners*, 1991-NMSC-070, ¶ 16, 112 N.M. 504, 817 P.2d 238 (N.M. 1991).

Any reliance Gould placed on Buck's representations regarding his compensation were not reasonably or justifiably relied upon given the express disavowal of any such agreements in his employment contract.

\* \* \*

Even assuming Buck told Gould that a signing bonus was not possible but that a "sell bonus is not at all a problem," (**Doc. 154 at 9–10 AMF ¶ D**) there is no evidence that Buck's representation was untrue or misleading. DW Partners admits as much—and agrees that "a signing bonus was not possible." **Doc. 148 at 21**. Nor was one paid.

As proffered by Buck, though, Gould's contract did contain a transaction bonus. *See* **Doc. 148-1 at 40–41 ¶ 3(a)–(c)**. If total transactions resulted in more than $20 million in cash being received by the SSLs, Gould would receive a percent bonus. *Id.* The record shows that SSLs only received $11.7 million in proceeds—which is below the $20 million threshold. As such, no bonus was earned.

Gould's allegations show nothing except that Buck made a material representation of fact that he knew was true at the time it was made. Under this theory, Gould's negligent misrepresentation claim also fails—because there is no false or misleading statement. *See* NMRA § 13-1632. As the Court stated before, Buck told Gould to "persuade Mr. Wyse" about any "bonus." **Doc. 54 at 11**. And that "is not the behavior of an individual who has a tacit understanding of himself or the entity he represents as party to any implied agreement." *Id.* **at 11–12**.

Summary judgment is required.

## II. Unjust Enrichment (Count II)

To succeed on a claim for unjust enrichment, Gould must show that (1) DW Partners "knowingly benefitted" at his expense (2) "in a manner such that allowance of the other to retain the benefit would be unjust." *City of Rio Rancho v. Amrep Sw. Inc.*, 2011-NMSC-037, ¶ 54, 150 N.M. 428, 260 P.3d 414 (N.M. 2011) (citation omitted). To prove such a claim, it is not enough that DW Partners were "merely enriched at [Gould's] expense: That enrichment must also be

unjust." *Ontiveros Insulation Co. v. Sanchez*, 2000-NMCA-051, ¶ 14, 129 N.M. 200, 3 P.3d 695 (N.M. Ct. App. 2000).

This begs the question: when is enrichment *unjust*?[11]

The unjust enrichment doctrine derives from a court's exercise of "its equitable powers." *Albuquerque Nat'l Bank v. Albuquerque Ranch Ests., Inc.*, 1982-NMSC-142, ¶ 52, 99 N.M. 95, 654 P.2d 548 (N.M. 1982); *Myers v. Armstrong*, 2014-NMCA-051, ¶ 10, 324 P.3 388 (N.M. Ct. App. 2014) (same). This means that a court can imply obligations, based on justice and equity—thereby imposing "a contractual relationship between parties, regardless of their assent." *Hydro Conduit Corp. v. Kemble*, 1990-NMSC-061, ¶ 21, 110 N.M. 173, 793 P.2d 855 (N.M. 1990). When evaluating a claim for unjust enrichment, a court "weighs the equities between the parties." *City of Rio Rancho*, 2011-NMSC-037, at ¶ 55. Usually, unjust enrichment results from wrongdoing.[12] But wrongdoing is not a hard-and-fast requirement.[13]

---

[11] The answer is "squishy." James S. Rogers, *Indeterminacy and the Law of Restitution*, 68 WASH. & LEE L. REV. 1377, 1377 (2011). *See, e.g., Miller v. Bourdage*, 1982-NMCA-153, ¶ 20, 98 N.M. 801, 653 P.2d 177 (N.M. Ct. App. 1982) ("The doctrine of unjust enrichment is broad and expansive in scope. It rests within the good conscience of the court . . . ."); *McAnulty v. Std. Ins. Co.*, 81 F.4th 1091, 1110 (10th Cir. 2023) ("The notion of what is or is not 'unjust' is an inherently malleable and unpredictable standard" (cleaned up)); Doug Rendleman, *When Is Enrichment Unjust? Restitution Visits an Onyx Bathroom*, 36 LOY. L.A. L. REV. 991, 1002 (2003) ("Enrichment and unjustness are spongy ideas."); *see also* RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 1 cmt. a (AM. L. INST. 2011) (explaining unjust enrichment "at the expense of another" also means "in violation of the other's legally protected rights").

[12] *See, e.g., Puma v. Wal-Mart Stores E., LP*, 523 P.3d 589, 600 (N.M. Ct. App. 2022) (noting a court looks to "a causal connection" between "wrongdoing and a measurable increase in . . . assets" when evaluating unjust enrichment), *rev'd on other grounds* 2024 N.M. Unpub. LEXIS 38, at *5 (N.M. 2024) (leaving "undisturbed . . . the Court of Appeals' . . . unjust enrichment discussion"); *Homes by Marilyn v. Robinson (In re Est. of McKim)*, 1991-NMSC-019, ¶ 7, 111 N.M. 517, 807 P.2d 215 (N.M. 1991) (unjust enrichment "involve[es] fraud or other wrongful conduct"); Anthony Duggan, *Proprietary Remedies in Insolvency: A Comparison of the Restatement (Third) of Restitution & Unjust Enrichment with English and Commonwealth Law*, 68 WASH. & LEE. L. REV. 1229, 1257 (2011) (explaining unjust enrichment "deter[s] fiduciary wrongdoing").

[13] *See Ridgway v. Ridgway*, 454 U.S. 46, 71 n.1 (Stevens, J., dissenting) ("Unjust enrichment . . . does not require the performance of any wrongful act . . . . Innocent parties may frequently be unjustly enriched."); *Developments in the Law—Unjust Enrichment: Introduction*, 133 HARV. L. REV. 2062, 2062 (2020)

\* \* \*

Here, Gould's unjust enrichment claim is based on the theory that DW Partners "received a financial benefit from the sale of the Eclipse Aviation debt." **Doc. 153 at 15**; **Doc. 55 at ¶ 53** (same). DW Partners argues the unjust enrichment claim should fail because "[Gould's] compensation was intended to be governed, and was in fact governed, by the terms of his employment contract." **Doc. 148 at 3**.

The Court agrees with DW Partners. Gould's compensation is governed by his employment contract with One Aviation. The undisputed material facts show that: (1) DW Partners was not a party to Gould's contract, (2) One Aviation agreed to pay Gould a transaction bonus upon receipt of cash proceeds over $20 million, (3) DW Partners was not an SSL, and (4) DW Partners did not receive any "cash" for the sale.

Unjust enrichment simply isn't the case here. A reasonable jury could not conclude the circumstances here were such that it was "unjust" for DW Partners not to compensate Gould under an employment contract—with a third-party (One Aviation)—when Gould failed to satisfy the transaction bonus's precondition. DW Partners' non-payment of a "transaction bonus" does not satisfy either element of unjust enrichment.

Rather, Gould's cause of action is born out of a validly executed contract—to which he now objects. But a failure to properly read a contract, or meet its terms for a bonus, does not mean that DW Partners was unjustly enriched. Summary judgment on this count is appropriate.

### III. Plain Meaning of the Employment Contract

In his Response, Gould argues that he thought he would "receive a portion of *any sale* that DW made." **Doc. 153 at 1** (emphasis added). Gould claims that he thought his "transaction bonus"

---

("[U]njust enrichment imposes liability based on the defendant's gain—regardless of a defendant's blameworthiness.").

12

was based on the receipt of cash and cash-like obligations. *Id.* **at 6**. Even though Gould negotiated the terms of his written employment contract with Wyse, Gould now claims he relied on Buck's earlier representations that DW Partners would pay him (because they were a "lender").

Resolution of this case hinges on the meaning of two of DW Partners' UMFs in particular. First, Gould argues that the contract's use of "cash" does not mean actual cash—rather, it means "cash and cash-like obligations." **Doc. 153 at 6**. Next, Gould asserts that DW Partners was a Senior Secured Lender to Eclipse. *Id.* **at 2–3 & 7**.

Neither argument has merit. In fact, both are undercut by the plain language of the employment contract. *See also* **Doc. 54 at 11** (finding "the contract is not 'ambiguous . . . .'").

\* \* \*

When a contract term is undefined, a court may "look to that term's usual, ordinary, and popular meaning," such as the one found in a dictionary. *United Nuclear Corp. v. Allstate Ins. Co.*, 2012-NMSC-032, ¶ 19, 285 P.3d 644 (N.M. 2012).

In this case, the Court finds the word "cash" as used in the "transaction bonus" clause means money. *See Cash*, OXFORD ENGLISH DICTIONARY (2d ed. 1989) (defining cash as "[m]oney; in the form of coin, ready money"). The use of "cash" in the employment contract does not mean "cash-like obligations" as Gould hopes.

Next, the Court turns to the employment contract's use of the phrase "Senior Secured Lenders." That phrase, although undefined, has a common meaning. A Senior Secured Lender is someone who holds a perfected first security interest in a debtor's assets. *See, e.g., Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 473 (1974) ("Secured creditors have by law a priority in the hierarchy" to unsecured creditors); *Bates v. United States (In re Bates)*, 974 F.2d 1234, 1235 (10th Cir. 1992) ("Generally speaking, the debts are then classified into three general categories:

13

secured, priority, and general unsecured debts."); Jim Fleet, *Turnaround Topics: Chapter 11 on Decline? Changes Are Here to Stay*, 31-2 AM. BANKR. INST. J. 17, 70 (2012) ("In cases of liquidation, the priority rule is that dollars go to administration followed by the senior secured lender and the junior secured lender."). This means a Senior Secured Lender has a higher priority claim than a junior secured lender or any unsecured lenders. For this reason, a "secured lender exercises far greater leverage and control over a borrower than an unsecured lender by virtue of the secured lender's security interest in assets of the borrower." A. Brooke Overby, *Bondage, Domination, And The Art of The Deal: An Assessment of Judicial Strategies in Lender Liability Good Faith Litigation*, 61 FORDHAM L. REV. 963, 977 (1993).

Gould claims that DW Partners was a Senior Secured Lender. This is incorrect. In his Response, Gould "disputes that DW Partners . . . was not a ***lender*** to Eclipse Aviation." **Doc. 153 at 2 & 7** (emphasis added). But as explained earlier, *see supra* n.4, whether DW Partners was a lender is immaterial. What matters—based on the employment contract's language—is whether DW Partners was a Senior Secured Lender. The undisputed material facts make clear DW Partners was **not** a Senior Secured Lender. Gould's attempt to create a factual dispute by referencing a different contract where DW Partners is a "lender" is not well-taken. *See* **Doc. 153 at 9 "AMF ¶ A"** (citing Ex. D). Not only is that contract not at issue, but that contract does not show that DW Partners was a Senior Secured Lender. Based on the record evidence and undisputed material facts, the Court concludes the Senior Secured Lenders are those entities listed by Wyse and sent to Gould on October 23, 2017. *See* **Doc. 148-1 at 30–33**.

\* \* \* \* \*

For the reasons stated above, this Court will "not give effect to" Gould's "subjective impressions, innermost thoughts, or private intentions." *Ponder*, 2000-NMSC-033, at ¶ 14

(citations omitted). This is especially true given the "jointly drafted" provision (**Doc. 148-1 at 44**) in Gould's employment contract. That provision undermines New Mexico's usual rule that ambiguities in a contract are construed against the drafting party. *See Omni Aviation Managers, Inc. v. Buckley*, 1982-NMSC-029, ¶ 15, 97 N.M. 477, 641 P.2d 508 (N.M. 1982). That principle usually applies when one party did not seek or receive any input from the other party while drafting the contract. *See Pub. Serv. Co. of N.M. v. Diamond D Constr. Co.*, 2001-NMCA-082, ¶ 19, 131 N.M. 100, 33 P.3d 651 (N.M. Ct. App. 2001) (citing *Schultz & Lindsay Constr. Co. v. State*, 1972-NMSC-013, ¶¶ 5–6, 83 N.M. 534, 494 P.2d 612 (N.M. 1972)). But here, the undisputed material facts show that Gould negotiated the employment contract's language. Gould cannot now benefit from purported ambiguities or promises not contained in the very contract he drafted.[14]

## IV. Damages

In New Mexico, punitive damages are "not a stand-alone claim." *Asbury v. MNT, Inc.*, No. 12-cv-252, 2014 U.S. Dist. LEXIS 174228, at *7 (D.N.M. Apr. 22, 2014) (Gonzales, J.) (citing *Salazar v. City of Albuquerque*, 776 F. Supp. 2d 1217, 1251 (D.N.M. 2011)); *see also Nordeen v. Select Portfolio Servicing Inc.*, No. 22-cv-180, 2023 U.S. Dist. LEXIS 177499, at *25 (D.N.M. Sept. 29, 2023) (Garcia, J.) (same). The same rings true for other damages. Without a viable substantive claim, damages are unavailable. *See, e.g.,* RESTATEMENT (SECOND) OF TORTS §§ 903 & 912 (AM. L. INST. 1979) (explaining "compensatory damages are "depended upon proof that the harm occurred as the result of the tortious conduct"); RESTATEMENT (SECOND) OF CONTRACTS

---

[14] Although Gould argues (**Doc. 153 at AMF ¶ E**) he "always made clear . . . he had to receive a guarantee from DW that it would pay any amounts owed to him," that assertion is belied by the record.

To be sure, Gould provided an email from October 2017 (**Doc. 153 at 68**) saying he wanted "guarantees" from DW Partners and Crystal that he would "get paid." But no such clause ended up in the employment contract. In the email provided by Gould, he also demanded a salary of $360,000 (**Doc. 153 at 68**). But he signed an employment contract with a salary of $330,000 (**Doc. 148-1 at 40 ¶ 3**). No doubt, Gould hoped he would get paid more. But his employment contract controls—he drafted it, and he signed it, so he is bound by it.

§ 346 (AM. L. INST. 1981) (requiring a predicate "breach of contract" prior to awarding "damages"); *Id.* at § 351 cmt. b (explaining "there can be no recovery" for consequential damages "unless it was foreseeable by the party in breach because of special circumstances"); *cf. Ill. Cent. R.R. Co. v. Crail*, 281 U.S. 57, 63 (1930) (stating "remedies . . . afform only compensation for the injury suffered").

Having granted summary judgment, *see supra* ¶¶ I & II, it necessarily follows that Gould's request for consequential damages and punitive damages (**Doc. 55 at ¶¶ 49, 50, 56**) must be **DISMISSED**. *See Howell Petrol. Corp. v. Leben Oil Corp.*, 976 F.2d 614, 622 (10th Cir. 1992) ("A request for damages . . . does not constitute a cause of action; rather damages are a remedy for a legal wrong."); *Sanchez v. Clayton*, 1994-NMSC-064, ¶ 13, 117 N.M. 761, 877 P.2d 567 (N.M. 1994) ("[T]he plaintiff must establish a cause of action before punitive damages can be awarded.").

## CONCLUSION

Gould says Buck lied and DW Partners benefited from that lie (**Doc. 153 at 1**). But Gould provides no evidence showing that DW Partners (or Buck) ever promised to pay him the "transaction bonus" contained in his employment contract with One Aviation. Nor did Gould establish that DW Partners was a Senior Secured Lender. Gould also failed to prove he triggered the $20 million clause to warrant this bonus.

Instead, the undisputed material facts make clear that:

- DW Partners is not a party to Gould's employment contract (**UMF at ¶ 25**);
- The employment contract was a "complete agreement" that was "jointly drafted" (**UMF at ¶¶ 39 & 40**; *see also* **Doc. 148-1 at ¶¶ 12 & 16**);
- DW Partners was not an SSL to One Aviation or Eclipse (**UMF at ¶¶ 5, 8, 9, 21**);
- And Gould's transactions did not exceed $20 million in "receipts of cash" (**UMF at ¶¶ 41–42**).

As a result, Gould's claims fail as a matter of law.

16

**IT IS THEREFORE ORDERED** that DW Partners' "Corrected Motion for Summary Judgment" (**Doc. 148**) is **GRANTED**.

**IT IS SO ORDERED**.

/s/

WILLIAM P. JOHNSON
SENIOR UNITED STATES DISTRICT JUDGE